718 A.2d 631

**Latrice BRANCH**

v.

**Joseph E. McGEENEY, et al.**

**No. 1844, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Oct. 2, 1998.

336

Richard S. Gordon, Towson (Law Office of Kieron F. Quinn, Towson, and William J. Carter and Carr, Godson, Lee & Warner, Washington, DC, on the brief), for appellant.

Rignal W. Baldwin, Jr., Jonathan P. Kagan and Brassel & Baldwin, P.A., Annapolis, for appellees McGeeney, Gruver and Koch.

Paul Garvey Goetzke, Annapolis, submitted on the brief for appellees City of Annapolis and Chief of Police, Joseph S. Johnson.

Submitted before WENNER and THIEME, JJ., and MARVIN H. SMITH, Judge (retired), Specially Assigned.

THIEME, Judge.

This action arises out of a nine-year-old girl's unfortunate run-in with Annapolis police officers who were operating under a mistaken understanding of state regulations governing the fingerprinting of juveniles. Appellant Latrice Branch filed the instant eight-count complaint by and through her mother and next friend, Teresa Hurley, in the Circuit Court for Anne Arundel County. The complaint sought damages and declaratory relief against three Annapolis police officers, the City of Annapolis, and Chief of Police Joseph Johnson, in his official capacity. Count I was a claim pursuant to 42 U.S.C. § 1983 for violations of appellant's federal constitutional rights, and Count II asserted tort claims for violations of analogous rights under the state constitution. Counts III though VII asserted common law claims for assault, battery, false arrest and imprisonment, malicious prosecution, and intentional infliction of emotional distress, respectively. Count VIII requested a declaratory judgment based on all the foregoing.

On cross motions for summary judgment, the lower court granted judgment in favor of all appellees and dismissed the complaint with prejudice. On the combined constitutional claims, the court ruled that appellant's rights had not been violated and also that there was no City policy to serve as a predicate to City liability. As to the federal constitutional

claims, the court further ruled that the officers enjoyed quali-
fied immunity from suit. The state common law claim for
intentional infliction of emotional distress failed due to the lack
of any evidence of extreme and outrageous conduct, and the
rest of the claims failed due to the presence of probable cause
to arrest. The lower court also found that the officers enjoyed
immunity from suit on all the state common law claims.

The questions presented on appeal are as follows:

I. Did the lower court err in not granting the appellant's
 motion for summary and declaratory judgment against
 the City of Annapolis?

II. Did the lower court err in granting the defendants'
 motions for summary judgment?

### Facts

The State of Maryland amended its regulations pertaining
to the collection of both adult and juvenile fingerprints effec-
tive 1 October 1994. This amendment contained the following
new language:

> B. Adults who have been arrested shall be fingerprinted
> on an arrest fingerprint card approved by the Director of
> the CJIS [Criminal Justice Information System] Central
> Repository and on an arrest fingerprint card approved by
> the Director of the Federal Bureau of Investigation.
>
> C. A juvenile who has been arrested shall be finger-
> printed on the arrest fingerprint card approved by the
> Director of the CJIS Central Repository.

COMAR 12.15.01.09–1. Also added was a provision defining
"arrest" as "the detention of an individual for the purpose of
criminal prosecution, for the filing of delinquency petitions, or
pursuant to existing charges or delinquency petitions." CO-
MAR 12.15.01.03.B.(1). The purpose for the entire amend-
ment, according to the Statement of Purpose, was to codify
existing practices regarding the fingerprinting of adults and
"to require that the fingerprints of a juvenile arrested for the
commission of a crime or a delinquent act which would be a
crime if committed by an adult shall be submitted to the

[CJIS] Central Repository." 21:7 Md. Register 558 (April 1, 1994).

In mid-August 1994, Mr. Tom Davis of CJIS met with Ms. Patricia Holland of the Annapolis Police Department's Central Records Section. Mr. Davis informed Ms. Holland of the new regulations regarding juvenile fingerprinting, and he gave her a copy of the above amendments from the Maryland Register. The next day, Ms. Holland drafted a Memorandum (hereinafter "the Memorandum") addressed to "All Sworn Officers, Annapolis Police Department" and designated "For Distribution Week of September 19, 1994." The Memorandum stated:

> Effective October 1, 1994, Juvenile's [sic] who are detained for the purpose of criminal prosecution, or for the filing of delinquent petition, or pursuant to existing charges of delinquent petition are to be fingerprinted on CJIS (State/Green) Cards, as well as Annapolis City Cards.

> Charges are not to be entered on the cards when they are submitted to the State of Maryland, therefore the FBI does not want to receive cards.

> For Your Information: The State is collecting cards for the MAFIS Fingerprint Identification System, so that they can more easily identify Juvenile offenders from fingerprints submitted from crime scenes.

As was normal practice, this Memorandum was approved by Ms. Holland's supervisor, Captain John Wright, prior to dissemination. Captain Wright also communicated orally with Mr. Davis before the Memorandum was released. The Memorandum was posted for all sworn officers to review, and copies were distributed to all officers through their shift commanders. Among the officers informed were appellees, Officer Joseph E. McGeeney, Jr., Corporal Joseph Gruver, and Officer Adam Koch.

This Memorandum somehow became imbued with a meaning that is not apparent from its text and which was not intended by the COMAR amendments. Officer McGeeney, Corporal Gruver, and Officer Koch each testified that he understood the Memorandum to embody a new policy that all

juveniles arrested by the police must be transported to the station house for fingerprinting, even if the arresting officer would otherwise have released the particular juvenile into the custody of his or her parents at the scene. All the officers also stated that they had been aurally informed of this alteration in standard procedures by their shift commander concurrent to the dissemination of the Memorandum. Such an interpretation of the Memorandum is in conflict with its actual words, because in the context of juvenile procedure, "detention" is (or should be) commonly understood to refer to the placement of children in "physically restricting facilities," Md. Code Ann., Cts. & Jud. Proc. § 3–801(m), and should not be confused with a mere arrest not involving a detention.

Ms. Holland testified that, at the time she drafted the Memorandum, she too was under the impression that the COMAR amendments embodied a change in police procedures regarding the transporting of juveniles to the station house. She implicated Mr. Davis from CJIS as the source of her misconception. In fact, when at a later date Mr. Davis clarified that the COMAR amendments did not require such a change in procedures, Ms. Holland expressed her surprise in a memorandum to Captain Wright, memorializing the fact that "we were both surprise[d] that [Mr. Davis] had changed his statements, regarding the juvenile fingerprinting." What little can be gleaned from the portions of Captain Wright's deposition included in the record extract indicates that his understanding of the new COMAR amendments was roughly the same as that held by Ms. Holland and the three officers. Mr. Davis was apparently not deposed. It thus appears that an aurally-transmitted, erroneous policy shadowed the State's official, written fingerprinting policy as it worked its way through the chain of command in the Annapolis Police Department. There is no evidence in the record that any other police departments in the state labored under any similar misconception.

The erroneous "shadow policy" also appears to contravene Maryland law. Under Md.Code Ann., Cts. & Jud. Proc. § 3–814(b) (1995 Repl.Vol.), a child must be released to his or her

parents "with all reasonable speed," upon the parents' written promise to bring the child to court when requested. The only exception to this rule occurs if the child is in need of shelter care or if further detention "appears required by § 3–815." That section requires detention only if the child needs protection from his or her environment, if the child is likely to flee, or if there is no parent or guardian to whose custody the child may be released.

About a month after the release of Ms. Holland's memorandum, police were called to the Betsy Court Apartments in Annapolis, where appellant had been playing a children's game with three of her friends. The four children were throwing acorns against the side of an apartment building next to a wooded area, trying to see who could hit the highest brick on the wall or land an acorn on the roof. One of the residents on that side of the building, Ms. Patricia Simms, became annoyed by the acorns striking her window. She told the children more than once to stop, but they continued their play. Ms. Simms then had one of her neighbors call the 911 emergency dispatch service.

Corporal Gruver and Officer McGeeney arrived on the scene separately and went to Ms. Simms's apartment to investigate. While in the apartment, both officers heard the sounds of objects striking the exterior of Ms. Simms's window, and Corporal Gruver actually observed appellant throw an object against the window. Ms. Simms told the officers that she wanted to press charges against appellant. The officers testified that they had no discretion to refuse Ms. Simms's demand, and appellant has not contended otherwise. The two officers took down the details of Ms. Simms's complaint. Officer Koch arrived on the scene and met the other two officers as they were preparing to leave Ms. Simms's apartment.

The three officers then left through the front door of the building with the intention of finding appellant and issuing a juvenile citation to her for destruction of property. Officer McGeeney and Corporal Gruver went around one side of the

building while Officer Koch took a longer route around the other side. Officer McGeeney and Corporal Gruver reached the rear of the building first, and they encountered appellant as she was attempting to re-enter the building through a rear door. They told her they were going to have to place her under arrest.

All three officers gave substantially identical testimony regarding how this incident would have been handled according to procedures in place before 1 October 1994. Appellant would have been briefly arrested, and the officers would have charged her by issuing her a citation. She would then have been released into the custody of her parent, or parents, at the scene. All three officers also testified that, as a result of the new policy effective 1 October 1994, they believed they were required to transport appellant to the police station for finger-printing and that they no longer had any discretion to release her into the custody of her parent.

Standard operating procedures require that any time an officer transports an individual, whether adult or juvenile, to the police station in a squad car, that individual must be handcuffed. Corporal Gruver testified that officers have some amount of discretion over the timing and manner of handcuffing in these situations, and it was his intention to wait until appellant was placed in the squad car before handcuffing her. He also would have cuffed her hands in front of her.

Corporal Gruver and Officer McGeeney began walking appellant back up the sidewalk toward the parking lot. She was between the two officers, and each officer had one hand on each side of appellant, holding her either by her arm or her sleeve. Appellant testified that one of the officers told her she was "going to jail." While they were walking, appellant's mother approached at a very brisk pace and in an understandably excited state. She protested the arrest and removal of her child and demanded her release. Accompanying appellant's mother were two other men, described by Corporal Gruver as "large" and "agitated." When Corporal Gruver saw the three approaching, he told Officer McGeeney to put hand-

cuffs on appellant. He explained that his reasons for ordering appellant handcuffed were for her own protection, given that he intended to retain custody over her.

> At that point, as I said, I was afraid we were going to have a physical confrontation. And I was standing next to a girl, a young child, and, quite frankly, I was worried about her safety. If we had gotten into a tussle with her mother and the two friends, she would have been in the middle. She could have gotten hurt. She could have taken an active part. All I needed was to have a nine or ten or whatever age she was grab ahold of my asp or gun and get involved and have to use force on her. I don't want that. I wanted that child out of the picture for her safety.

> And at that point I told McGeeney to cuff the child. And I told him that to take her out of the picture to keep her from getting involved in any problems we were going to have. That's why we cuffed her there.

Officer McGeeney obeyed, cuffing appellant's hands behind her back. Appellant testified that she was made to kneel during the handcuffing.

Appellant was escorted to the police car and placed inside it. She was crying. A crowd began to gather. Appellant's mother demanded appellant's release. Corporal Gruver explained to appellant's mother and to others present that a new policy required the officers to transport appellant to the police station for fingerprinting. Appellant's mother attempted to speak with appellant, but the officers did not permit her to do so. According to appellant's mother, Corporal Gruver repeatedly told her and appellant to "shut up." Appellant's mother also claimed that one of those two officers, although she could not say which one, had made a disparaging remark about the "coloreds" present.

Corporal Gruver grew concerned over the size and manner of the crowd, and he doubted that appellant's fingerprints were worth the risk of a confrontation. He radioed his sergeant and asked for special permission to release appellant into her mother's custody. Permission was granted. There

was some dispute as to how long appellant was kept inside the police car, but the longest duration supported by appellant's citations to the record extract is twenty-five minutes. She was neither transported to the police station nor fingerprinted.

Officer McGeeney let appellant out of the car, took the handcuffs off her, brought her inside her mother's home, and issued her a juvenile citation. He also explained to them that the new fingerprinting policy had necessitated placing appellant in the police car. Officer McGeeney then exited the building and left the scene soon after.

Officer Koch's role in this matter was extremely limited. He had taken the longer route around the apartment building, and when he rounded the end of the building he saw that appellant had already been handcuffed and a crowd had already gathered. He never touched appellant and served a purely back-up role. He was the last of the officers to arrive at the scene and the first to leave it.

Corporal Gruver remained some time longer, and he continued explaining to concerned neighbors the reasons behind the officers' actions. Corporal Gruver was both the first of the three officers to arrive at the Betsy Apartments and the last officer to leave, and police records indicate that he was on the scene for a total of thirty-two minutes.

This incident apparently brought some much-needed attention to the divergence that had occurred between the policy contained in the COMAR amendments and the aurally-transmitted "shadow policy" of transporting and fingerprinting all juveniles arrested. Mr. Davis provided clarification that the COMAR amendments were not intended to alter the circumstances under which juveniles were to be transported to a police station. Within a month, the Memorandum was officially rescinded.

### Analysis

**I. City policy**

Appellant first claims that the lower court erred in granting summary judgment in favor of the City and the

Police Chief on the issue of whether the officers' actions were attributable to any City policy. While municipalities can be sued for damages under § 1983, they are only liable for their own constitutional violations, and cannot be held liable under a theory of *respondeat superior. Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Therefore, even if the three officers violated appellant's federal constitutional rights, the City of Annapolis will not be liable therefor unless the officers acted pursuant to a City policy. The claims against Chief of Police Johnson require no separate consideration, because he was sued in his official capacity, which is analytically the same as a suit against the City. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). We point out, however, that the presence or absence of a City policy will have no practical effect on appellant's claims against the City and the Chief for analogous violations of the State constitution, because *respondeat superior* is available in tort actions based on State constitutional rights. *Town of Port Deposit v. Petetit,* 113 Md.App. 401, 423, 688 A.2d 54 (1997).

When confronted with the question of whether a particular policy may fairly be attributed to a municipality, a court must "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989). Only policies adopted by such officials and bodies can fairly be said to be municipal policy. The identification of municipal policymakers is purely a matter of state law. *McMillian v. Monroe County, Alabama,* 520 U.S. 781, ——, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997).

There is no evidence in the record of any official higher than Captain Wright having any knowledge of either the Memorandum drafted by Ms. Holland or the mistaken interpretation of COMAR that shadowed the Memorandum. The

City concedes that Chief of Police Johnson possesses final policymaking authority for the City on matters concerning the custody of juveniles, but appellant has not drawn our attention to any legal authority indicating that Captain Wright has any final policymaking authority for the City of Annapolis at all. Instead, appellant argues that Captain Wright had final *decision-making* authority with regard to Ms. Holland's Memorandum and similar matters. The Supreme Court has instructed, however, that these two types of discretionary authority are not the same, for if "the mere exercise of discretion by an employee [*i.e.*, final decision-making authority] could give rise to a constitutional violation [by a municipality], the result would be indistinguishable from *respondeat superior.*" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).

Furthermore, it does not appear that the policy in question even falls within the realm of decision-making authority granted by the City to Captain Wright. The Memorandum he approved repeats substantially *verbatim* the fingerprinting procedures mandated by the COMAR amendments, but it says nothing whatsoever regarding the custody, release, or transportation of juveniles. Captain Wright was in charge of the police Technical Services Division, which included Ms. Holland's department, Central Records. Although by all accounts Captain Wright had some decision-making authority over the City's fingerprinting and reporting procedures, there is nothing in the record to indicate that he had any decision-making authority regarding the custody, release, and transportation of juveniles. Even if Captain Wright were to shoulder some of the blame for the dissemination of the "shadow policy" (and we do not mean to say that he does), that would not make the "shadow policy" a City policy, for the simple reason that Captain Wright has no final authority whatsoever over such matters.

Appellant argues that several deponents who were designated to testify on behalf of the City referred to the "shadow policy" as "a new policy," which, according to appellant, constitutes an admission that official City policy was at issue. We

need say nothing more than that the identification of final policymaking authority is a question of state law rather than a question of testimonial fact, *McMillian, supra,* and appellant has not provided any legal support for her contention that Captain Wright has any authority with regard to the "policy" actually at issue here. We find that no official policy of the City of Annapolis is at issue in this case and, consequently, the City (and the Chief of Police) cannot be held liable for any alleged violations of appellant's federal constitutional rights.

## II. Claims of legal error regarding constitutional rights

### A. Excessive force and immunity

Appellant has asserted that there are various genuine issues of material fact that should have precluded the lower court from granting summary judgment in favor of appellees. Summary judgment is not appropriate where there are genuine disputes of material fact. *White v. Friel,* 210 Md. 274, 285, 123 A.2d 303 (1956). A material fact is one the resolution of which will somehow affect the outcome of the case. *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974).

The disputes referred to by appellant are allegedly relevant to three separate issues, which appellant attempts to address in a single argument. The first issue is whether the officers' use of force was reasonable. The reasonableness of the officers' use of force is material to appellant's constitutional claims of excessive force. The standards for such a claim are the same under both the federal Fourth Amendment and Articles 24 and 26 of the Maryland Declaration of Rights. *Williams v. Prince George's County,* 112 Md.App. 526, 547, 685 A.2d 884 (1996). The test for whether police officers have used excessive force is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). The Supreme Court has explained that intent is not relevant to this test: "An officer's evil intentions will not make a Fourth Amendment

violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* The objective test is modified, however, by the need to step into the officer's shoes:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer in the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d [1028,] 1033 [ (1973) (Friendly, J.) ], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1871 (other citations omitted).

The second issue raised is whether the officers harbored malice. This is a subjective inquiry, material to the officers' immunity for the state common law claims. Under Md.Code Ann., Cts. & Jud. Proc. § 5–321(b)(1), the officers are immune from these claims if the officers acted "without malice." This type of malice has been defined as "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Port Deposit*, 113 Md.App. at 416, 688 A.2d 54. In their briefs to this Court, the officers have not contended that they have immunity from the state constitutional law claims under § 5–321(b)(1).

The third issue is whether the officers knew or reasonably should have known that their actions violated a "clearly established" constitutional right. This issue is relevant to the officers' claims of qualified immunity from suit for violations of the federal constitution, as no such immunity exists for violations of such "clearly established" rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To be clearly established, "[t]he contours of the

right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Some of appellant's claims of factual dispute fail for lack of evidentiary support. These include claims that appellant suffered any physical injury, that she sought treatment of a psychiatrist for severe mental distress, and that the officers told members of the crowd besides appellant and her mother to "shut up." Either appellant has failed to cite to any portion of record extract in support of the allegation or the pages cited contain no such evidence.

Other claims of factual dispute are simply meritless. Appellant claims that the court erroneously determined that appellant had engaged in disorderly conduct, but the court had merely determined that the officers possessed probable cause to arrest appellant for disorderly conduct, and appellant has not shown a dispute of fact as to probable cause. Appellant also cites portions of the record for the proposition that the officers were "abusive," but this is a conclusory characterization and does not present a factual issue.

As for appellant's legitimate claims of factual disputes, the evidence read in a light most favorable to appellant demonstrates the following:

- appellant did not try to run away;
- appellant did not struggle;
- the officers were not in fear of appellant;
- only one officer saw appellant throw only one object;
- the officers made no attempt to locate appellant's mother;
- the officers refused to let appellant's mother speak with appellant; and
- the officers told appellant and her mother to "shut up."

Reading all of the evidence in a light most favorable to appellant, we find no material dispute with regard to any of the issues raised by appellant. As for reasonableness, the

facts remain that the officers had probable cause to arrest and that appellant was not physically injured in any way. Handcuffing appellant was entirely reasonable under the circumstances, given that she was already under arrest, she would soon be handcuffed for transport anyway, and the officers feared for her safety. In fact, as the lower court noted, failure to handcuff her under the circumstances might have been unreasonable. The decision to cuff her hands behind her back as opposed to in front may not have been absolutely necessary, but there is no way that this variation amounted to an unreasonable use of force. Appellant also claimed that she was forcibly placed on her knees while she was being handcuffed, but we reiterate that she suffered no physical injury. We believe that this is precisely the type of conduct the Supreme Court had in mind when it said that not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. If the cuffing of appellant was to have its intended protective effect, it would have to be accomplished before the appellant's mother and her two large friends encountered the officers and appellant. Speed was thus a factor in the protective handcuffing. Under the circumstances, the decision to immobilize appellant briefly (and without injury) in order to ensure a quick cuffing process was entirely reasonable.

As for malice, we moot the point by ruling that the lower court correctly granted summary judgment as to each state common law claim. The officers possessed probable cause to arrest appellant, which disposes of appellant's claims of malicious prosecution, *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146 (1978), false imprisonment, false arrest, assault, and battery. *Williams,* 112 Md.App. at 554, 685 A.2d 884. The only other claim is for intentional infliction of emotional distress, which requires conduct that is "extreme and outrageous." *Kentucky Fried Chicken Nat'l Management Co. v. Weathersby,* 326 Md. 663, 670–71, 607 A.2d 8 (1992). We agree with the lower court that there has been no evidence presented of the type of extreme and outrageous conduct necessary to survive summary judgment on this tort

claim. (Appellant has not even challenged this finding.) Without any surviving common law claims, we have no occasion to address the officers' immunity with regard to those claims.

Appellant mentions only two constitutional rights that were allegedly "clearly established" as of the date of the central incident. The first of these is the "right to be free from excessive force." We have already ruled that this right was not violated. The second right is "appellant's liberty interests created by [Maryland law]." We interpret this as a reference to appellant's right to procedural due process, a right which we address on substantive grounds a few paragraphs below. We will defer addressing this immunity issue until after we have discussed the underlying claim, but we note here that we believe the lower court erred in granting summary judgment on this narrow immunity issue.

## B. Due Process Clause claims

Appellant argues that the lower court erred in granting summary judgment on her three claims arising under the federal Due Process Clause. This clause is generally interpreted as being synonymous with article 24 of the Maryland Declaration of Rights. *Oursler v. Tawes,* 178 Md. 471, 483, 13 A.2d 763 (1940). First, appellant argues that the policy evinced in the Memorandum is void for vagueness. Depending on which "policy" appellant is referring to, either the point is moot or appellant lacks standing. If appellant is referring to the aurally transmitted "shadow policy" requiring the transportation of all juveniles arrested, then the point is moot, because appellant concedes that the Memorandum has been rescinded and that this policy is no longer in effect. There is nothing left for a court to void, and any potential injury suffered by appellant as a result of any alleged vagueness must be addressed under other legal principles. If, however, appellant is referring to the actual fingerprinting policy apparent on the face of the Memorandum and the COMAR amendments, then she lacks standing because she

was never present at a police station and was never finger-printed.

Second, appellant argues that the officers violated her substantive due process right to be free from excessive police interference. The Supreme Court has interpreted § 1983 to require that, where a separate provision of the federal constitution provides a more specific legal standard, that standard and not the standards of substantive due process must govern the federal constitutional claim. *Graham*, 490 U.S. at 394, 109 S.Ct. at 1870–71. Appellant's substantive due process claim is so closely associated with her Fourth Amendment excessive force claim that the standards of the Fourth Amendment must govern. We have already ruled that the officers' conduct satisfies the requirements of the Fourth Amendment.

Maryland law has no analog to § 1983, so we address appellant's state substantive due process claim exactly as she has presented it. This standard, however, is less favorable to appellant. The only police actions that violate substantive due process are those which "shock the conscience" of the court. *County of Sacramento v. Lewis*, 523 U.S. 833, ——, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998); *Rochin v. California*, 342 U.S. 165, 172–73, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952). For all the reasons that we previously discussed in concluding that the officers did not use excessive force, we similarly conclude that the police interference does not shock this Court's conscience.

Third, appellant claims that the police violated her right to procedural due process by depriving her of a liberty interest without adequate procedural safeguards. This claim has two important differences from the previous constitutional claims in that liberty interests can be predicated upon state law as well as constitutional norms, and the officers appear to have been in violation of state law when they initially refused to release appellant into her mother's custody. None of the appellees have argued that appellant has been afforded due process, so the key issues before us are whether appellant had

a protected liberty interest and whether she was deprived of this interest.

While some liberty interests are so fundamental that they are inherently subject to protections of procedural due process, states are also capable of creating new liberty interests, which then become entitled to federal constitutional protection. *Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). Most of our experience with these liberty interests has been in the setting of prisoners' rights, *e.g., Angell v. Henneberry,* 92 Md.App. 279, 607 A.2d 590 (1992); *Holmes v. Robinson,* 84 Md.App. 144, 578 A.2d 294 (1990); but there is no constitutional principle limiting the doctrine to such a setting. *See In re Adoption/Guardianship No. 2633,* 101 Md.App. 274, 646 A.2d 1036 (1994) ("[T]he preservation of the foster care family unit for adoptive purposes is not a liberty interest protected by the Constitution. Indeed, any interest arising form the foster care relationship is limited to that derived from the laws that create it."). Appellant has asserted a liberty interest that, as with the prisoners' rights cases, occurs within the general realm of release from state custody. Her alleged interest just arises far earlier in the custodial process.

Not every statute, however, creates a protected liberty interest. As we said in *Angell, supra:*

> [T]he State *may* create a liberty interest ... if the State places substantive limitations on the exercise of the decision-maker's discretion. But to have that effect those limitations must involve more than mere procedural guidelines to channel the decisionmaking of ... officials; they must constitute particular standards or criteria [to] guide the State's decisionmakers.

92 Md.App. at 292–93, 607 A.2d 590 (citations and internal quotations omitted). One of the hallmarks of a substantive limitation is the use of " 'explicit mandatory language,' *i.e.,* specific directives to the decision-maker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dept. of Corrections v. Thompson,* 490 U.S.

454, 462, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). On the other hand, "[i]f the decisionmaker is 'not required to base its decision on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' ... the State has not created a constitutionally protected liberty interest." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (internal citation omitted) (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981)).

Under 3–814(b) of the Courts and Judicial Proceedings Article,

> If a law enforcement officer takes a child into custody he shall immediately notify, or cause to be notified, the child's parents. . . . After making every reasonable effort to give notice, the law enforcement officer shall with all reasonable speed:
>
> (1) Release the child to his parents, ... upon their written promise to bring the child before the court when requested by the court, and such security for the child's appearance as the court may reasonably require, unless his placement in detention or shelter care is permitted and appears required by § 3–815; or
>
> (2) Deliver the child to the court or a place of detention or shelter care designated by the court.

We are aware of only one precedent interpreting this subsection. In *Jones v. State*, 311 Md. 398, 535 A.2d 471 (1988), a seventeen-year-old juvenile who was arrested for murder argued that the State's unlawful failure to notify his parents in accordance with this subsection had an impact upon the voluntariness of his subsequent confession. The Court ruled that the subsection, and the entire juvenile subtitle, were inapplicable because the juvenile court never had any jurisdiction in the matter. The Court's analysis is not directly relevant to the question before us, but the Court did base its analysis on its belief that "[t]he purpose of § 3–814(b)," including both the notification and the release provisions, "is to protect the child

from unnecessary separation from a parent or guardian." *Id.* at 407, 535 A.2d 471.

We first note that § 3–814(b) employs the verb "shall," which is "presumed mandatory on the parties, denoting an imperative obligation inconsistent with the exercise of discretion." *Witt v. Ristaino,* 118 Md.App. 155, 172, 701 A.2d 1227 (1997) (quoting *Robinson v. Pleet,* 76 Md.App. 173, 544 A.2d 1 (1988)); *see also Comptroller of the Treasury v. Nelson,* 345 Md. 706, 716, 694 A.2d 468 (1997). The subsection requires that an officer first "immediately" notify the child's parents and then requires that the officer release the child "with all reasonable speed," subject to certain potential exceptions. Just because the officer need only use "reasonable speed" in releasing the child, as opposed to the "immediat[e]" need to notify the child's parents, does not introduce any discretion into the fundamental decision of whether to release the child; "reasonable" speed merely contemplates that procedures incident to release may work an unavoidable delay.

Assuming that a parent or other suitable adult is available, as was true in the instant case, § 3–814(b)(1) contemplates only three possible situations in which the officer would not have to release the child with all reasonable speed. Release may be conditioned upon the parent's "written promise to bring the child before the court" and "such security for the child's appearance as the court may reasonably require." Neither provision calls for any discretionary act on the part of the officer. We furthermore read these two conditions according to their location in the text as being in the nature of conditions subsequent, such that the duty to release the child arises even before these conditions are implicated.

The third situation is contained in the "unless" clause, and it authorizes an officer to refuse to release the child only if either "detention" or "shelter care" "appears required" by § 3–815. "Detention" is defined in the subtitle as "the temporary care of children who, pending court disposition, require secure custody for the protection of themselves or the community, in physically restricting facilities"; shelter care is "the

temporary care of children in physically unrestricting facilities." § 3–801. According to § 3–815(b), detention is only permitted if:

(1) Such action is required to protect the child or person and property of others;

(2) The child is likely to leave the jurisdiction of the court; or

(3) There are no parents, guardian, or custodian or other person able to provide supervision and care for the child and return the child to the court when required.

Shelter care is permitted only if one of the foregoing three circumstances is present and if additional conditions are met. § 3–815(c). These are all substantive restrictions on the discretion of police officers to release juveniles. If the conditions are not met, the juvenile must be released with all reasonable speed. There is no allowance in this statute for an officer to decide to retain custody over the child for any other reasons.

■■■■ To be precise, § 3–814(b) authorizes an officer to place a child in detention or shelter care when such action "appears" required under § 3–815, as well as when such action is actually required. This feature of the statute takes account of the fact that police officers have neither the time nor the resources to engage in adjudicative fact-finding and must be given leeway in their initial determinations of the facts. While § 3–814(b) thus gives deference to the officer's view of the facts, it does not give an officer any discretion over the decision of whether to release a juvenile. If it does not appear to the officer that the requirements of § 3–815 are met, then the officer cannot make an independent judgment that release would nevertheless be inappropriate; the officer must release the child to the parent's custody with all reasonable speed.

We are aware that a purely structural analysis of § 3–814(b) could support an interpretation that a police officer has complete and unfettered discretion over whether to release a child. This interpretation, however, must be rejected outright as being contrary to the words, the context, and the intent of the

subsection. It is possible to read the statute as being satisfied if an officer simply "with all reasonable speed: (1) Release[s] the child [unless certain conditions are met]; *or* (2) Deliver[s] the child to the court or a place of detention or shelter care designated by the court." Under this reading, the statute expresses no preference one way or the other as to whether the child is released or delivered to court. Such a reading ignores the subsection's established purpose of protecting a child from unnecessary separation from a parent, makes a mockery of the mandatory parental notification provision, and ignores the restraints placed on this same discretion under §§ 3–814(b)(1) and 3–815(b) and (c).

Based on all the foregoing, we conclude that appellant had a protected liberty interest based on § 3–814(b) of the Courts and Judicial Proceedings article to be released by the police to her mother "with all reasonable speed." The statute uses explicit mandatory language and places substantive limitations on the exercise of an officer's discretion over the custody of juveniles. Decisions of whether a child shall be released to a parent are directed by objective and defined criteria. Unless the criteria are met, the juvenile must be released.

 The next question is whether appellant was denied her liberty interest in being released "with all reasonable speed." Reading all of the evidence in a light most favorable to appellant, we cannot say as a matter of law that the speed with which she was released was "reasonable," as the term is understood in the statute. The officers provided deposition testimony indicating that they continued to restrain appellant for reasons completely unrelated to any of the factors in § 3–814 or 3–815 and after appellant's mother made herself known to the officers for a period that may have been as long as twenty-five minutes. We cannot say as a matter of law that appellant's release was effectuated with all reasonable speed. We reverse the lower court as to appellant's procedural due process claim.

 We previously deferred addressing federal qualified immunity for this procedural due process claim. As we noted,

qualified immunity is available unless the official violates a clearly established federal constitutional right. That exception applies here. Even though the liberty interest at issue arose under *state* law, it is protected under the *federal* Due Process Clause and thus qualifies as a federal constitutional right. In many cases, a right is not clearly established until some judicial precedent is handed down, but here the right is set down in mandatory terms in a state statute last amended in 1990. It is hard to get much more clearly established than that. We admit to some concern that we are bootstrapping a violation of a state statute onto an abrogation of federal immunity, but the Supreme Court appears to be comfortable with just such a result. In *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), a former state employee sued his former state agency alleging that his termination violated the federal procedural Due Process Clause. He also argued that the defendants had lost their immunity because they had violated a state regulation, albeit a regulation that was not the source of the claim. The Supreme Court ruled that a violation of an unrelated statute or regulation does not result in a loss of immunity, but it explained an important distinction in a footnote:

> [O]fficials may lose their immunity by violating clearly established statutory rights. This is the case where the plaintiff seeks to recover damages for violation of those statutory rights.... [O]fficials sued for violations of rights conferred by a statute or regulation ... do not forfeit their immunity by violating some other statute or regulation. Rather, these officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages. And if a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation....
>
> ... Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—

of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon.

*Id.* at 194 n. 12, 104 S.Ct. at 3018 n. 12 (quotations and internal citations omitted).

In the instant case, the officers are alleged to have violated § 3–814(b), which is the same statute upon which appellant's action for damages under § 1983 and the federal constitution is predicated. The Supreme Court has stated that in such situations officials do not enjoy immunity. We find that as a matter of federal law the officers have lost their qualified immunity on the federal due process claim.

■■■ Having arrived at this juncture, we cannot in good conscience allow the appellant to proceed against Officer Koch. As the lower court noted in the course of dismissing the entire complaint:

Officer Koch has minimal involvement with the Plaintiff. In fact, Officer Koch did not order Plaintiff's arrest, never touched Plaintiff, never spoke to Plaintiff, and participated only as a backup to other Defendant Officers. However, as Defendant Officers suggest, he is not treated separately in this opinion. This Court believes that the above stated facts and the following discussion reveal his lack of participation.

We agree with the lower court. There is no evidence that Officer Koch deprived appellant of her right to procedural due process. We will affirm the lower court with respect this one appellee.

## C. Equal protection

■■■ Lastly, appellant argues that the officers discriminated against appellant on the basis of her age in violation of Article 24 of the Maryland Declaration of Rights. In appellant's complaint, the equal protection claim appeared to be based on racial discrimination, but in her summary judgment filings appellant addressed both race-based and age-based discrimination. The lower court granted summary judgment in favor of appellees on the equal protection claim, but in doing so the court addressed only race-based discrimination.

Appellant now abandons the race claim and focuses solely on the claim of age discrimination. The officers have argued that because appellant did not mention age-based discrimination in her complaint that we should not address this claim, but we do not believe there is any such heightened pleading rule. We are now in as good a position to address her age-based claims as was the lower court.

The Maryland equal protection principle applies " 'in a like manner and to the same extent as' " the federal Equal Protection Clause. *Murphy v. Edmonds,* 325 Md. 342, 354, 601 A.2d 102 (1992). The officers have stated in their depositions that they would not have attempted to transport appellant to the station house for fingerprinting but for the fact that she was between the ages of eight and seventeen. This is certainly adequate evidence to implicate age discrimination.

Claims of discrimination on the basis of age are reviewed under rational basis scrutiny, meaning that the official action must be rationally related to a legitimate state purpose. *Vance v. Bradley,* 440 U.S. 93, 96–97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313–14, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). Appellant argues that a higher level of scrutiny is required for age-based claims, but, in each of the cases she cites for support, heightened scrutiny was applied only because a fundamental right was at issue. *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (right to seek an abortion); *Carey v. Population Servs. Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (same); *Brown v. Ashton,* 93 Md.App. 25, 36 n. 3, 611 A.2d 599 (1992) (right of freedom of movement), *rev'd on other grounds without reliance on fundamental rights analysis,* 339 Md. 70, 660 A.2d 447 (1995). Nowhere in appellant's equal protection arguments has she identified a fundamental right entitling her to heightened scrutiny. We are cognizant of her substantive due process claim to a fundamental right "to be free from excessive police interference," but we are aware of no precedent for applying heightened equal protection scrutiny based

on such a right. Neither is appellant's fundamental right to freedom of movement at issue, because she was already validly taken into custody by the police prior to the point at which the officers allegedly discriminated against her on the basis of her age by deciding to transport her to the police station instead of promptly releasing her. Appellant appears to be trying to base heightened scrutiny upon some sort of fundamental right to an immediate release, but we find no supporting law. We apply rational basis scrutiny.

The officers' decision not to release appellant immediately into the custody of her mother but instead to transport her to the police station for fingerprinting was rationally related to a legitimate state purpose. The legitimate state purpose was the collection of fingerprints for addition to the CJIS database, which serves as a valuable investigatory resource. The fingerprinting of appellant would have rationally furthered this purpose. The fact that the officers would not have treated an adult similarly under the circumstances is of no moment under rational basis scrutiny. It is true that the officers tended to characterize their decision to transport appellant as one mandated by the department policy as they believed it to be and not as one based on independent reasoning. Nevertheless, they made a conscious decision to follow their perceived orders, and this decision survives rational basis scrutiny.

To clarify the current posture of the case, only appellant's procedural due process claims survive the motion for summary judgment. The federal claim survives only against appellees Corporal Gruver and Officer McGeeney. The State claim survives against these same two officers plus appellee the City of Annapolis in *respondeat superior*. There is no remaining basis for liability of the Chief of Police, who was sued in his official capacity only.

The last issue to be addressed is the dismissal of the declaratory judgment, Count VIII. As the Court of Appeals stated in *Broadwater v. State*, 303 Md. 461, 465, 494 A.2d 934 (1985):

Legions of our cases hold that a demurrer, the type of motion to dismiss here involved, is rarely appropriate in a declaratory judgment action.

And

Numerous of our cases have said that in a declaratory judgment action the court must declare the rights of the parties.

*Id.* at 468, 494 A.2d 934.

**JUDGMENT REVERSED AS TO COUNTS I AND II BUT ONLY WITH REGARD TO APPELLEES JOSEPH E. McGEENEY, JR., JOSEPH GRUVER, AND THE CITY OF ANNAPOLIS, AND REVERSED AS TO COUNT VIII; AFFIRMED IN ALL OTHER RESPECTS. CASE RE-MANDED TO THE CIRCUIT COURT FOR ANNE ARUN-DEL COUNTY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY REMAINING APPELLEES.**