**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1608**

E.W., a minor, by and through her next friend and mother, T.W.,

Plaintiff – Appellant,

v.

ROSEMARY DOLGOS, School Resource Officer, in her individual capacity,

Defendant – Appellee,

and

WICOMICO COUNTY SHERIFF'S DEPARTMENT,

Defendant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:15-cv-03982-JFM)

Argued: May 10, 2017                    Decided: February 12, 2018

Before GREGORY, Chief Judge, WYNN, Circuit Judge, and SHEDD, Senior Circuit Judge.

Affirmed by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wynn joined. Senior Judge Shedd wrote a separate opinion concurring in the judgment.

**ARGUED:** Robin Ringgold Cockey, COCKEY, BRENNAN & MALONEY, PC, Salisbury, Maryland, for Appellant. John Francis Breads, Jr., Hanover, Maryland, for Appellee. **ON BRIEF:** Laura E. Hay, COCKEY, BRENNAN & MALONEY, PC, Salisbury, Maryland, for Appellant.

―――――――――

GREGORY, Chief Judge:

This matter involves a school resource officer's decision to handcuff a calm, compliant elementary school student for fighting with another student three days prior. The child brought a claim under 42 U.S.C. § 1983 for excessive use of force in violation of the Fourth Amendment and several state law claims. On a motion for summary judgment, the district court concluded that the officer's conduct did not amount to a constitutional violation and that the officer was entitled to both federal qualified immunity and state statutory immunity under the Maryland Tort Claims Act ("MTCA"). For the reasons that follow, we affirm the district court's judgment.

I.

Because this case arises from a grant of summary judgment, we set forth the material facts in the light most favorable to Appellant E.W., the non-movant. *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011) (en banc).

On Tuesday, January 6, 2015, ten-year-old E.W. rode a school bus to East Salisbury Elementary School in Salisbury, Maryland. E.W. sat in an aisle seat on one side of the bus while another student, A.W., sat diagonally across from her in an aisle seat one row behind E.W. on the opposite side of the bus. The two schoolgirls both had their feet in the aisle: E.W. was facing sideways with her feet in the aisle, and A.W. was facing forward with her left leg in the aisle, extended in the direction of E.W.

Video footage from the school bus's surveillance camera shows A.W. swaying her left knee from side to side in the aisle. ECF No. 18 (DVD filed with Joint Appendix,

3

hereinafter "Video"), at 0:10. Several seconds later A.W. raised her left leg in the air and made a sudden, stomping motion in the direction of E.W.'s leg. Video 0:24. E.W. later reported that A.W. had stomped on her shoe. In response to the stomp, E.W. immediately stood up and faced A.W., who was slouched in her seat. Video 0:26. The bus driver then asked E.W. what she was doing. E.W. sat down, took off her backpack, and removed what appeared to be two lanyards from around her neck. Video 0:26–38. A few seconds later, E.W. stood up again and raised her leg towards A.W. Video 0:40. As E.W. raised her leg, A.W., still sitting, also raised hers. Video 0:40. Because A.W. was slouched in her seat, she was able to extend her leg further than she would have sitting fully upright. The two girls appear to trade kicks before E.W. put her leg down and A.W. slid lower into her seat. Video 0:41.

E.W. then stood over A.W. and began hitting her, swinging her arms downward because of their height difference. Video 0:41–45. Although the seat in front of A.W. obscured the camera's view of the scuffle, the way A.W. was sitting suggests that E.W.'s swings likely landed on A.W.'s left arm, shoulder, and possibly her head. Video 0:46–48. After four seconds, E.W. returned to her seat. Video 0:46–48. Shortly thereafter, E.W. looked at A.W., stood up, and again moved in A.W.'s direction. Video 0:54–55. A.W. raised her leg in the air, and E.W. kicked at A.W.'s shoe several times while A.W. kicked back. Video 0:56–59. During the exchange of kicks, A.W. appeared to laugh and say something to E.W. Video 0:56–59.

4

This exchange drew the attention of the bus driver, who called both E.W. and A.W. to the front of the bus and eventually suspended both girls from the bus for three days. Video 1:00–2:15; J.A. 22–23.

On Friday, January 9, 2015, the school contacted Appellee Rosemary Dolgos, a deputy sheriff and school resource officer ("SRO") in Wicomico County, about the scuffle. When she arrived at the school, Dolgos watched the surveillance video described above. Dolgos spoke to A.W. first, asking her if she was injured. A.W. pulled up her left pant leg, and Dolgos observed "two small, bluish bruise[s]" above the left knee and one on the side of A.W.'s leg. J.A. 23. Notably, no other injuries, including upper body injuries, were reported.

E.W. was then removed from class and placed in a closed office with Dolgos and two school administrators. Dolgos told E.W. that she was there to discuss what took place on the bus. But, in Dolgos's estimation, "E.W. [did not] seem to care." J.A. 23. E.W. explained, "A.W. stepped on my shoe so I kicked her and started to hit her." J.A. 23. Dolgos attempted to emphasize to E.W. the seriousness of the situation and the possible repercussions, telling her that adults could be jailed for such behavior. Still, in Dolgos's opinion, "E.W. continued to act as if the situation simply was not a 'big deal.'" J.A. 23. Dolgos then decided to take E.W. into custody.

Dolgos placed E.W. in handcuffs from behind and reseated her. Dolgos inserted two fingers between the handcuffs and E.W.'s wrists to ensure that they were not too tight. In her affidavit, Dolgos stated that she was concerned about the physical safety of herself and the school administrators because of both the incident she observed in the surveillance

5

video and E.W.'s apathy. Dolgos expressed concern in the affidavit that E.W. might act violently against her or someone else if she attempted to walk E.W. from the school to her patrol car. Dolgos also admitted, however, that she had no idea whether E.W. had "any past or current behavioral issues or past involvements with law enforcement." J.A. 24. According to Dolgos, E.W. stood 4'4" and weighed about 95 pounds, while Dolgos stands 5'4" and weighs 155 pounds.

Immediately after being handcuffed, E.W. began to cry. She explained that she did not want to go to jail and that she would not hit A.W. again. Dolgos kept her handcuffed for about two minutes as she cried and apologized. Dolgos averred that E.W. never complained that the handcuffs were too tight or displayed bruises to her. Rather, "[i]n response" to E.W.'s show of remorse, Dolgos decided not to arrest E.W. and removed the handcuffs. J.A. 24–25. "Based on [E.W.'s] remorse," Dolgos further decided to release E.W. to her parents. J.A. 25. The school contacted E.W.'s mother, T.W., and Dolgos informed T.W. that she would refer the matter to the Wicomico County Department of Juvenile Services. T.W. responded by asking, "[f]or a kid fight?" and "[s]o you're going to put my 10 year old daughter in the system when she's 10?" J.A. 25. Frustrated and upset by the treatment of her daughter, T.W. retrieved E.W. from the school.

On December 29, 2015, E.W., by and through T.W., filed this suit against Dolgos,[1] alleging (1) a violation of the Fourth Amendment under 42 U.S.C. § 1983 for unreasonable seizure and excessive force; (2) a violation of Article 26 of the Maryland Declaration of

---

[1] E.W. also sued the Wicomico County Sheriff's Department but voluntarily dismissed those claims.

Rights; (3) battery; and (4) assault. Dolgos filed a motion to dismiss or, in the alternative, for summary judgment, which the district court construed as one for summary judgment and then granted. In a short paragraph, without citing any case law, the district court concluded that Dolgos's actions did not amount to excessive force because E.W. was handcuffed for only two minutes and then released to her mother. The court further concluded that Dolgos was "at least" entitled to qualified immunity as to the § 1983 claim. J.A. 71. And as to the state law claims, the court found that E.W. failed to prove that Dolgos acted with malice or gross negligence. E.W. timely appealed.

## II.

E.W. first maintains that the district court erred by granting summary judgment to Dolgos for her § 1983 claim. We review de novo a district court's order granting summary judgment.[2] *See Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). "Summary judgment is

---

[2] We note that E.W. contests the district court's use of the summary judgment standard, but does not appear to challenge the court's conversion of the motion to dismiss to one for summary judgment.

We generally review a district court's conversion of a motion to dismiss to a summary judgment motion for abuse of discretion. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). E.W. has not shown any abuse of discretion. E.W. was on notice that the motion could be converted to one for summary judgment because Dolgos styled it in the alternative, and E.W. similarly submitted an opposition brief in the alternative. *See id.* (holding that a district court did not abuse its discretion by converting motion with alternative caption because parties were on notice that it could be disposed of as motion for summary judgment). We therefore apply the same standard used by the district court. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 419–20 (4th Cir. 2014) (reviewing district court's grant of summary judgment under same legal standard as district court).

7

appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" *Purnell*, 652 F.3d at 531 (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

E.W. argues that the district court erred by concluding that Dolgos did not use excessive force and was entitled to qualified immunity. Qualified immunity shields government officials from liability in a § 1983 suit so long as their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) "whether that right was clearly established at the time of the alleged violation." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016) (quoting *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015)). To defeat the officer's entitlement to immunity, the answer to both questions must be in the affirmative. *Id.*

Courts are no longer required to analyze these questions sequentially, but it is often the "better approach" to "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (quoting *Pearson*, 555 U.S. at 232). Indeed, the Supreme Court has recognized that "following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 563 U.S. 692, 707 (2011). To "provide

8

guidance to those charged with the difficult task" of protecting students "within the confines of the Fourth Amendment," we exercise our discretion to first decide whether a constitutional violation occurred. *Id.* (internal quotation marks omitted); *see Armstrong*, 810 F.3d at 899 (exercising discretion to address excessive force issue because issue does not "frequently arise in cases in which a qualified immunity defense is unavailable" (internal quotation marks omitted)). And our discussion of the alleged constitutional violation is "[n]o mere dictum" because "a constitutional ruling preparatory to a grant of immunity creates law that governs the official's behavior." *Camreta*, 563 U.S. at 708.

## A.

We begin by considering whether Dolgos used excessive force in violation of the Fourth Amendment when she handcuffed E.W. "The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). We analyze whether an officer has used excessive force under an objective reasonableness standard. *Purnell*, 652 F.3d at 531. Determining the reasonableness of an officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Ray*, 781 F.3d at 101 (quoting *Graham*, 490 U.S. at 396). We examine the officer's actions "in light of the facts and circumstances confronting [her], without regard to [her] underlying intent or motivation." *Graham*, 490 U.S. at 397; *accord Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017) ("Subjective factors involving the

9

officer's motives, intent, or propensities are not relevant." (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994))).

For this inquiry, *Graham* encourages us to evaluate three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. But these factors are not "exclusive," and we may identify other "objective circumstances potentially relevant to a determination of excessive force." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). Here, we believe it prudent to consider also the suspect's age and the school context. The ultimate "question [is] whether the totality of the circumstances justified a particular sort of . . . seizure." *Jones*, 325 F.3d at 527–28 (alternation in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)); *see Ray*, 781 F.3d at 101 ("To properly consider the reasonableness of the force employed we must 'view it in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005))).

Here, the parties dispute whether handcuffing E.W. was justified under the circumstances. E.W. asserts that such physical restraint was unnecessary because Dolgos did not have a reasonable safety concern. Dolgos argues in response that because she had probable cause to arrest E.W. for assaulting A.W., as seen on video and as E.W. concedes, *see* Md. Code Ann, Crim. Law § 3-203(a) (West 2015) (defining second-degree assault), she was justified in using handcuffs to effectuate the arrest.

10

In *Brown v. Gilmore*, we stated that "a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified . . . in effecting the underlying arrest." 278 F.3d 362, 369 (4th Cir. 2002). There, the plaintiff brought an excessive force claim based on allegations that a police officer had handcuffed her, causing her wrists to swell, dragged her to the police cruiser, and then pulled her into the vehicle. *Id.* at 365-66, 369. We found that the circumstances justified the "minimal level of force applied" because, as the officer approached a crowded scene on the street, he attempted to arrest the plaintiff for failure to follow another officer's orders to move her car. *Id.* at 369. We stated that it was not "unreasonable for the officers to believe that a suspect who had already disobeyed one direct order would balk at being arrested. Handcuffing [the plaintiff] and escorting her to a police vehicle was thus reasonable under the circumstances." *Id.*

But this Court has never held that using handcuffs is *per se* reasonable. Rather, the Fourth Amendment requires us to assess the reasonableness of using handcuffs based on the circumstances. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context."); *Garner*, 471 U.S. at 7–8 (holding that probable cause to arrest does not automatically justify manner in which search or seizure is conducted). A lawful arrest does not categorically legitimize binding a person's wrists in chains. *See Soares v. State of Conn.*, 8 F.3d 917, 921 (2d Cir. 1993) ("[W]e reject defendants' invitation to adopt a *per se* rule that the use of handcuffs in effecting an arrest is always reasonable."). And the troubling facts of the present case highlight why such a *per se* rule would be ill-advised.

11

The circumstances in this case are markedly different from those in *Brown*. We are not considering the typical arrest of an adult (or even a teenager) or the arrest of an uncooperative person engaged in or believed to be engaged in criminal activity. Rather, we have a calm, compliant ten-year-old being handcuffed on school grounds because she hit another student during a fight several days prior. These considerations, evaluated under the *Graham* framework, demonstrate that Dolgos's decision to handcuff E.W. was unreasonable.

The first factor considers the severity of the underlying offense. *Graham*, 490 U.S. at 396. At the time Dolgos handcuffed E.W., Dolgos knew that E.W. had at most committed misdemeanor assault in the second degree by hitting another little girl for stepping on her foot. *See* Md. Code Ann. Crim. Law § 3-203(a). But because assault is an offense that can be considered violent if committed by any person, even a child, we find that this factor weighs against E.W. This finding is tempered, though, by the fact that the offense is a misdemeanor.[3]

The second factor identified in *Graham*, whether the suspect poses an immediate threat to the safety of the officer or others, weighs strongly in E.W.'s favor. *See* 490 U.S. at 396. In assessing the threat an individual poses, it is often useful to consider the suspect's conduct at the time of the arrest and "the size and stature of the parties involved." *See Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004); *see also C.B. v. City of Sonora*, 769 F.3d 1005, 1030 (9th Cir. 2014) (en banc). In *Solomon*, the Sixth

---

[3] Even the concurrence characterizes this offense as "relatively minor." *Post* at 45.

Circuit concluded that a suspect did not pose a safety threat because she had no weapons, she made no threats, and she was several inches shorter and weighed one hundred pounds less than the arresting officers. 389 F.3d at 174. Similarly, in *Sonora*, the Ninth Circuit held that "a calm, compliant, but nonresponsive 11-year-old child," who weighed about eighty pounds and stood around 4'8" tall, did not pose a safety threat, particularly given the child was "surrounded by four or five adults at all times." 769 F.3d at 1030.

Here, Dolgos could not have reasonably believed that E.W. presented any immediate risk of harm to anyone. Like the adult suspect in *Solomon*, E.W. had no weapons and made no threats, *see* 389 F.3d at 174, and like the eleven-year-old in *Sonora*, she was calm and compliant as Dolgos spoke to her, *see* 769 F.3d at 1030. In fact, Dolgos recognized that E.W. appeared calm. *See* J.A. 23–24. Also similar to the suspects in *Solomon* and *Sonora*, E.W., at 4'4" and ninety-five pounds, was quite small relative to Dolgos, the arresting officer, who was a foot taller and sixty pounds heavier. *See Sonora*, 769 F.3d at 1030; *Solomon*, 389 F.3d at 174. Not to mention, E.W. was in a closed office and surrounded by two school administrators and a deputy sheriff. Given these facts, E.W. posed little threat even if she were to become aggressive.

The significant time that had elapsed—without incident—since the fight on the bus further negates any notion that E.W. posed an immediate threat. While the scuffle took place on Tuesday, January 6, East Salisbury Elementary School waited three days to even contact Dolgos. In the interim, E.W. was allowed to and did in fact attend school without incident, indicating that she did not pose a risk to the children around her, much less to the adults. *See Williams v. Nice*, 58 F. Supp. 3d 833, 838 (N.D. Ohio 2014) (finding reduced

13

need to use force because student was no longer disruptive when officer arrived). When Dolgos interacted with E.W. on Friday, January 9, E.W. was not hostile or even disobedient. Rather, E.W. remained seated and submissive during the entire interview, even as Dolgos placed the handcuffs on her.

Moreover, Dolgos had no reason to think that the scuffle between E.W. and A.W. was anything but an isolated incident. E.W. had no prior behavioral issues or involvement with law enforcement, nor did Dolgos have any indication that she did. The use of force is an intrusion on Fourth Amendment rights, and an officer must have a reason for using or escalating force. *See Graham*, 490 U.S. at 396 (intrusions on Fourth Amendment rights must be reasonably necessary given countervailing governmental interests). Even as to the altercation on the school bus, E.W., while unjustified in retaliating, did not become violent without physical provocation by A.W. Indeed, even a child with a history of attacking school officials should not be handcuffed if, at the time of handcuffing, she did not present a danger. *See S.R. v. Kenton Cty. Sheriff's Office*, No. 15-143, 2017 WL 4545231, at *5– 6, *9 (E.D. Ky. Oct. 11, 2017) (hereinafter "*Kenton II*"). All of these circumstances, taken together, show that E.W. posed no immediate threat to the safety of the officer or others to justify the use of handcuffs.

The third factor discussed in *Graham*, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, also strongly favors E.W. *See* 490 U.S. at 396. Dolgos does not even suggest that E.W. attempted to resist or flee from the office at any point. *See, e.g.*, *Sonora*, 769 F.3d at 1030 (handcuffing student was unreasonable in part because no evidence suggested that nonresponsive eleven-year-old was likely to run away);

14

*Solomon*, 389 F.3d at 173–74 (unreasonable use of force in part because arrestee did not attempt to flee or otherwise resist arrest). *Cf. Brown*, 278 F.3d at 369–70 (finding that officer was justified in handcuffing plaintiff who was actively and violently resisting arrest).

The suspect's age again favors E.W. Circuit and district courts around the country have recognized that youth is an important consideration when deciding to use handcuffs during an arrest.[4] The Ninth Circuit, applying the *Graham* factors, held that officers who handcuffed an eleven-year-old child used excessive force. *Tekle v. United States*, 511 F.3d 839, 846 (9th Cir. 2007) ("He was cooperative and unarmed and, most importantly, he was eleven years old."); *see also Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (holding that officer used excessive force against ten-year-old girl under *Graham* analysis). In addition, the Eleventh Circuit has held that "handcuffing was excessively intrusive given [the arrestee's] young age." *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1300–01, 1306 (11th Cir. 2006) (denying qualified immunity to SRO who handcuffed nine-year-old student for five minutes). Several district courts have similarly held that young age is a "uniquely" or "highly relevant" consideration under *Graham*. *See Kenton II*, 2017 WL 4545231, at *9 (holding that handcuffing eight-year-old child violated constitution); *Hoskins v. Cumberland Cty. Bd. of Educ.*, No. 13-15, 2014 WL 7238621, at *7, 11 (M.D.

---

[4] This consideration makes particular sense given the risk of lasting trauma among children exposed to the criminal justice system at young age. *E.g.*, *Sonora*, 769 F.3d at 1012 ("Following [handcuffing] incident, C.B. experienced a host of psychological and emotional problems, including difficulty sleeping, low self-esteem, anger, irritability, and depression.").

Tenn. Dec. 17, 2014) (noting that eight-year-old student "was a startlingly young child to be handcuffed"); *see also James v. Frederick Cty. Pub. Sch.*, 441 F. Supp. 2d 755, 757, 759 (D. Md. 2006) (concluding that handcuffing eight-year-old child suggested excessive force). Here, E.W. was only ten years old at the time of the arrest. She therefore falls squarely within the tender age range for which the use of handcuffs is excessive absent exceptional circumstances.

The concurrence seems to suggest that elementary school children like E.W. are so inherently unpredictable and uncontrollable that officers would be reasonable in restraining them for our collective safety. Unsurprisingly, the concurrence's authorities do not actually support that position or apply to this case. The concurrence cites to *Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361 (6th Cir. 1998), for the proposition that young children are "unpredictable, in need of constant attention and supervision," such that "[e]ven momentary inattention or delay in dealing with a potentially dangerous or emergency situation could have grievous consequences." *Post* at 41 (quoting *Knox*, 158 F.3d at 378). What the concurrence leaves out is that *Knox* was discussing whether teachers may be required to undergo drug-testing in order to *protect* young children, who "could cause harm to themselves or others while playing at recess, eating lunch in the cafeteria (if for example, they began choking), or simply horsing around with each other." *See* 158 F.3d at 378–79. Unless the concurrence suggests that we handcuff children as a reasonable method of "supervision" to prevent choking and horseplay, *Knox* has little relevance to the case at hand. If anything, *Knox* suggests that adults may have to take on otherwise unreasonable burdens under the Fourth Amendment to accommodate children's unique

16

needs. Similarly, the concurrence cites to *United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000), but it addresses an officer's interest in protecting an arrestee by requiring him to wear a shirt and shoes outside. *See id.* at 333; *Post* at 41. Needless to say, handcuffs are different from shoes, and there is no indication in this case that there was any danger *to* E.W. that justified her wearing handcuffs. The concurrence also cites to *Hedgepeth ex rel. Hedgepeth v. W.M.A.T.A.*, 386 F.3d 1148 (D.C. Cir. 2004), but that case expressly noted that the plaintiff did not bring a traditional Fourth Amendment claim, and the court did not even consider an excessive force argument. *See id.* at 1159; *Post* at 42. Finally, *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255 (10th Cir. 2015), another case the concurrence cites, is not contrary to our holding, as it merely held that age does not categorically remove all safety concerns. *See id.* at 1259 ("[A]n arrestee's age does not necessarily undermine an officer's concern for safety and need to control the situation." (citation and alternations omitted)); *Post* at 41. We agree and therefore do not establish a *per se* rule in this case.[5] Contrary to the concurrence's suggestion, we are in good company in concluding that age is a relevant consideration in an excessive force analysis.

---

[5] To the extent that *Bernalillo* held that the use of handcuffs was reasonable on an eleven-year-old student, it is distinguishable because the officer there witnessed the student attack a teacher, an act considerably more serious than E.W.'s conduct in this case, and unlike this case, no time had elapsed between the student's offense and the arrest. *See* 806 F.3d at 1257. *Bernalillo* is also of limited utility because it does not conduct a *Graham* analysis and is against the weight of extra-circuit authority already discussed above. *See id.* at 1257–59.

The location of the arrest also weighs in E.W.'s favor because all relevant activity took place in the school context.[6] Courts have found that officers should exercise more restraint when dealing with student misbehavior in the school context. *See Hoskins*, 2014 WL 7238621, at *7 (holding that school setting, along with suspect's young age, is "uniquely relevant" consideration under *Graham* analysis); *see, e.g.*, *Sonora*, 769 F.3d at 1030 (noting significance of school setting); *Kenton I*, at *4–5 (same). Society expects that children will make mistakes in school—and, yes, even occasionally fight. That teachers handle student misbehavior and unruliness "on a routine basis without the use of any force" suggests that force is generally unnecessary in the school context.[7] *See Nice*, 58 F. Supp. 3d at 838. Furthermore, as with age, the school context presents unique considerations not present when officers patrol the streets. The use of handcuffs, for instance, may undermine students' perception of the school and their willingness to attend, thereby disrupting their education far beyond the time they actually spend in handcuffs.[8] And being handcuffed is

---

[6] *See* Statement of Interest of the United States at 20–22, *Kenton I*, 2015 WL 9462973 (No. 15-143) (Department of Justice urging courts to consider school context in evaluating need for handcuff-use).

[7] Research shows that "the presence of an SRO at a school significantly increased the rate of arrests" for minor misbehavior that previously would have been handled through in-school disciplinary measures. Elizabeth A. Shaver & Janet R. Decker, *Handcuffing a Third Grader? Interactions Between School Resource Officers and Students with Disabilities*, 2017 Utah L. Rev. 229, 247 (2017).

[8] *See, e.g.*, Lanette Suarez, *Restraints, Seclusion, and the Disabled Student: The Blurred Lines Between Safety and Physical Punishment*, 71 U. Miami L. Rev. 859, 878 (2017) ("Restraints and seclusion, when used as a form of physical punishment, erodes students' confidence in their teachers and their schools."); *see also* Udi Ofer, *Criminalizing the Classroom: The Rise of Aggressive Policing and Zero Tolerance Discipline in New*

often a source of stigma, which can lead to alienation and further disrupt long-term outcomes.[9] In other words, the use of handcuffs and force is not reasonably expected in the school context because it is counterproductive to the mission of schools and school personnel. For these reasons, the school setting—especially an elementary school—weighs against the reasonableness of using handcuffs.

Viewing the facts in the light most favorable to E.W., the totality of the circumstances weighs against Dolgos and demonstrates that her actions were not "'objectively reasonable' in light of the facts and circumstances confronting" her. *Graham*, 490 U.S. at 397. Our reasonableness analysis incorporates "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* But the circumstances here were by no means tense, uncertain, or rapidly evolving such that Dolgos was required to make any split-second decisions. Dolgos observed a ten-year-old girl sit calmly and compliantly in a closed office surrounded by three adults and answer questions about an incident with another little girl that had occurred several days prior. Although Dolgos stated she "believed there was a possibility that [E.W.] could physically act out against me or anyone else nearby as we left the school to go to my patrol car," J.A.

---

*York City Public Schools*, 56 N.Y.L. Sch. L. Rev. 1373, 1401 (2012) ("[Z]ero tolerance policies create an unwelcoming school environment for all students, leading to feelings of detachment from school and a greater willingness to leave the school environment.").

[9] Ofer, *supra* note 8 (noting that such effects fall disproportionately on students of color and students with disabilities).

24, and although E.W. argues that Dolgos handcuffed her at the outset merely because E.W. "didn't seem to care" about the incident with A.W., J.A. 23, Dolgos's subjective motives are not relevant to our reasonableness inquiry. We consider neither whether Dolgos had a subjective safety concern nor whether she intended to teach E.W. to appreciate the consequences of her actions.[10] Rather, we consider whether a reasonable officer would have determined that E.W. should be handcuffed as a means of effectuating her arrest.

The district court considered only the amount of time E.W. was handcuffed and that she was released to her mother, but we are required to assess the *totality* of the circumstances presented to properly assess Dolgos's conduct. *Jones*, 325 F.3d at 527–28 (citing *Garner*, 471 U.S. at 8–9). A reasonable officer, in addition to discerning E.W.'s small stature and calm and compliant disposition, would know that the bus driver who observed the incident between E.W. and A.W. found them mutually culpable, as he suspended both girls from the bus for three days. Further, the officer would know that E.W. attended school and sat in class among other children without incident from Tuesday, January 6, 2015 to Friday, January 9, 2015. No reasonable officer confronted with this information would have determined that handcuffing E.W. for any amount of time was justified under the circumstances. As such, we find that Dolgos acted unreasonably.

---

[10] Contrary to the concurrence's conclusion, we are not allowed to consider that Dolgos handcuffed E.W. for safety reasons related to the transport. *Post* at 32–33; *see Pegg*, 845 F.3d at 120 ("Subjective factors involving the officer's motives, intent, or propensities are not relevant.").

Dolgos argues that any alleged injury E.W. suffered as a result of the handcuffs was *de minimis*. Even so, the severity of the physical injury resulting from the force used is but one "consideration in determining whether force was excessive." *See Jones*, 325 F.3d at 530. Police officers will not be absolved of liability merely because their conduct, however unreasonable, results in only *de minimis* injury. *See Tennessee*, 471 U.S. at 8–9 (explaining that the relevant inquiry examines "the nature and quality" of the seizure and "whether the totality of the circumstances justified a particular sort of . . . seizure"). That the handcuffs did not cause E.W. more pain does not diminish the disproportionality of Dolgos's actions in light of the circumstances.

Dolgos took a situation where there was no need for any physical force and used unreasonable force disproportionate to the circumstances presented. We therefore find that Dolgos's actions amount to excessive force. As such, E.W. has demonstrated a violation of her constitutional rights under the Fourth Amendment.

B.

Because we conclude that Dolgos's conduct was unreasonable and violated E.W.'s Fourth Amendment rights, we must next examine whether Dolgos violated a clearly established right. A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. *See Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). The unlawfulness of the officer's conduct need only be

21

"manifestly apparent from broader applications of the constitutional premise in question." *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004). Put differently, a right may be clearly established if "a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) (alterations omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). As such, an officer can be "on notice that their conduct violates established law even in novel factual circumstances." *Armstrong*, 810 F.3d at 907 (quoting *Hope*, 536 U.S. at 741). But, to be held liable, the officer must in fact have notice.

Even though general statements of law may provide notice, *see Hope,* 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)), courts must not "define clearly established law at a high level of generality," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, we must examine "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). This examination is "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). The Fourth Amendment context requires a high level of specificity because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (alteration omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

At the time Dolgos seized E.W., the law was clear that, as a general matter, an officer must carefully measure the force used to respond to the particulars of a case,

22

including the wrongdoing at issue, the safety threat posed by the suspect, and any attempt to evade arrest or flee. *See Graham*, 490 U.S. at 396; *Ray*, 781 F.3d at 101. But the Supreme Court has emphasized that *Graham* is "cast at a high level of generality," *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Brosseau*, 543 U.S. at 199), and does not by itself "create clearly established law outside 'an obvious case,'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Brosseau*, 543 U.S. at 199). Here, Dolgos handcuffed a calm, compliant ten-year-old who was surrounded by multiple adults in a closed room for hitting another child three days earlier. While E.W.'s right not to be unreasonably handcuffed is clearly implicated by "more general applications of the core constitutional principle invoked," *Owens*, 372 F.3d at 279 (quoting *Amaechi v. West*, 237 F.3d 356, 362–63 (4th Cir. 2001)), namely, the right to be free from the use of excessive and unreasonable police force, we cannot say that her seizure amounts to an "obvious case" such that *Graham* put Dolgos on sufficient notice that her conduct was unlawful.

This case is unlike *Turmon v. Jordan*, in which we concluded under *Graham* that it was obvious the officer "could not point his gun at an individual's face," pull the individual out of his hotel room, and "handcuff him when there was no reasonable suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention." 405 F.3d 202, 208 (4th Cir. 2005). There, the officer's conduct was an obvious violation of the Fourth Amendment because the plaintiff was compliant and non-threatening, and there was no evidence that the plaintiff was or had been engaged in any criminal activity. *See id. Cf. Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (per curiam) (applying *Graham* to

23

conclude that "[i]t would have been 'apparent' to a reasonable officer in [defendant's] position that, after he had pinned to the ground a woman half his size and the woman did not pose a threat to him, it was unreasonable to push her face into the pavement with such force that her teeth cracked," even though she was resisting arrest).

Conversely, it was not obvious that Dolgos could not handcuff E.W. here. Although precedent supports the conclusion that Dolgos acted unreasonably and violated E.W.'s Fourth Amendment rights, it did not put Dolgos on sufficient notice that her conduct was unlawful. Indeed, this Court previously stated that the use of handcuffs would "rarely" be considered excessive force when the officer has probable cause for the underlying arrest. *See Brown*, 278 F.3d at 369. And the parties do not point us to any controlling authority sufficiently similar to the situation Dolgos confronted. In fact, E.W. chiefly relies on *Graham* to define the clearly established law. Without more, we cannot conclude that it would have necessarily been clear to a reasonable officer that handcuffing E.W. would give rise to a Fourth Amendment violation. We emphasize, however, that our excessive force holding is clearly established for any future qualified immunity cases involving similar circumstances.

Accordingly, we conclude that E.W.'s right not to be handcuffed under the circumstances of this case was not clearly established at the time of her seizure. As such, Dolgos is entitled to qualified immunity, and we affirm the district court as to the § 1983 claim.

III.

E.W. next argues that the district court erroneously concluded that she could not prove that Dolgos acted with malice or gross negligence. We first note that the standard for analyzing excessive force claims under Article 26 of the Maryland Declaration of Rights is the same for analyzing Fourth Amendment claims. *Purnell*, 652 F.3d at 536 (citing *Randall v. Peaco*, 927 A.2d 83, 89 (Md. Ct. Spec. App. 2007)). As such, our conclusion that Dolgos used excessive force in violation of the Fourth Amendment also applies to E.W.'s state constitutional claim. Our conclusion similarly applies to E.W.'s assault and battery claims. *See French v. Hines*, 957 A.2d 1000, 1037 (Md. 2008) (noting that when an officer uses excessive force she loses the privilege to commit assault and battery while effectuating an arrest); *Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000) (applying Fourth Amendment excessive force analysis to common law battery claim).

But, under the MTCA, Md. Code Ann., State Gov't, §§ 12-101–12-110 (West 2017), Maryland officials are immune from liability for state constitutional violations and tortious acts "committed within the scope of their duties when the violations are made 'without malice or gross negligence.'" *Purnell*, 652 F.3d at 536 (quoting *Lee v. Cline*, 863 A.2d 297, 307 (Md. 2004)); Md. Code Ann., State Gov't § 12-101(a)(6) (defining deputy sheriffs as state personnel); § 12-105. And, unlike the federal qualified immunity inquiry, the question of immunity under the MTCA is a subjective one for the trier of fact. *Newell v. Runnels*, 967 A.2d 729, 763 (Md. 2009).

For purposes of MTCA immunity, "malice" refers to so-called "actual malice," *i.e.*, "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and

25

deliberate wrongdoing, ill-will or fraud.'" *Lee*, 863 A.2d at 311 (quoting *Shoemaker v. Smith*, 725 A.2d 549, 559 (Md. 1999)). Malice can be "inferred from acts and circumstantial evidence," as it is "seldom admitted and need not be prove[n] by direct evidence." *Newell*, 967 A.2d at 763 (quoting *Henderson v. Md. Nat'l Bank*, 366 A.2d 1, 5 (Md. 1976)). And gross negligence entails "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper v. Rodriguez*, 118 A.3d 829, 845–46 (Md. 2015) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007)). An officer's action can also be grossly negligent if she "inflicts injury intentionally or is so utterly indifferent to the rights of others that [she] acts as if such rights did not exist." *Id.* at 846 (quoting *Barbre*, 935 A.2d at 717). The question of gross negligence is typically a question for the jury but can be determined as a matter of law when the facts clearly show that no reasonable jury could find that the defendant's actions amounted to gross negligence. *Id.* (quoting *Taylor v. Harford Cty. Dep't of Social Servs.*, 862 A.2d 1026, 1034 (Md. 2004)).

We conclude that there is insufficient evidence in the record for a reasonable jury to conclude that Dolgos acted maliciously or with gross negligence when she handcuffed E.W. As stated above, the evidence demonstrates that Dolgos was not reasonably in fear for her or anyone else's safety. Instead, Dolgos was bothered by E.W.'s lack of remorse or concern for hitting A.W. This is evident from Dolgos's own affidavit. J.A. 24–25. As Dolgos spoke to E.W. about the incident, she observed that E.W. did not seem to care. Displaying the maturity of a ten-year-old child, E.W. believed that the incident was not a

26

big deal because A.W. should not have stepped on her shoe. Due to E.W.'s attitude, Dolgos handcuffed her. And, again much like a ten-year-old child, E.W. began crying profusely and apologizing because she was afraid of going to jail. Dolgos stated that she then removed the handcuffs about two minutes later "[b]ased on E.W.'s remorse" and "[i]n response" to her crying. J.A. 24–25. This evidence does not demonstrate "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure" E.W. *Williams v. Mayor & City Council of Baltimore*, 753 A.2d 41, 57 n.16 (Md. 2000) (quoting *Leese v. Baltimore County*, 497 A.2d 159, 179 (Md. Ct. Spec. App. 1985)). And a reasonable jury could not find that Dolgos's actions demonstrate "a reckless disregard of the consequences as affecting" E.W.'s life or "a thoughtless disregard of the consequences" that would arise from handcuffing her. *Cooper*, 118 A.3d at 845–46 (quoting *Barbre*, 935 A.2d at 717). Rather, a reasonable jury could infer that Dolgos's actions were motivated by a desire to dissuade E.W.'s apathy and induce remorse. Though callous, such a motive does not amount to malice or gross negligence. *Cf. Barbre*, 935 A.2d at 702–03, 718–19 (holding that unarmed plaintiff had "presented sufficient facts to demonstrate gross negligence on the part of" deputy sheriff who ordered him to raise his hands, saw him comply, approached with gun drawn, and shot him in the neck); *Lee*, 863 A.2d at 312 (concluding that plaintiff demonstrated inference of malice by alleging that deputy sheriff stopped him initially for routine traffic matter, but prolonged stop for 40 minutes, called a canine unit to conduct a drug scan of vehicle, and referred to him as a "suspect" because he was African-American). We therefore conclude that Dolgos is entitled to immunity under the MTCA and affirm the district court.

27

IV.

"School-based policing is the fastest growing area of law enforcement."[11]  While the officers' presence surely keeps the nation's children safe, officers should not handcuff young students who may have committed minor offenses but do not pose an immediate threat to safety and will not evade arrest.  Unnecessarily handcuffing and criminally punishing young schoolchildren is undoubtedly humiliating, scarring, and emotionally damaging.  We must be mindful of the long-lasting impact such actions have on these children and their ability to flourish and lead prosperous lives—an impact that should be a matter of grave concern for us all.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[11] Amanda Merkwae, *Schooling the Police:  Race, Disability, and the Conduct of School Resource Officers*, 21 Mich. J. Race & L. 147, 158 (2015) (quoting The Nat'l Ass'n of Sch. Res. Officers, https://nasro.org/ (last visited Aug. 25, 2017)).

SHEDD, Senior Circuit Judge, concurring in the judgment only:

The majority appears to agree that Deputy Dolgos had probable cause to arrest E.W. for her violent assault on another student and authority to take E.W. into custody for transport to juvenile authorities. Moreover, the majority does not contend that the deputy *decided to arrest and take E.W. into custody* for an improper reason. For our purposes, therefore, the custodial arrest itself is lawful. Because there is no evidence that Deputy Dolgos used additional force or that E.W. was injured during the arrest, E.W.'s excessive force, assault, and battery claims hinge solely on the deputy's use of handcuffs. Ultimately, the majority affirms summary judgment on immunity grounds, and that holding (with which I agree) suffices to end this litigation. *See, e.g.*, *A.M. v. Holmes*, 830 F.3d 1123, 1152 (10th Cir. 2016) (holding that an officer who lawfully arrested and handcuffed a thirteen-year-old student for disrupting a class by repeatedly burping was entitled to qualified immunity on the student's excessive force claim "because there was no clearly established law indicating that [the student's] minor status could negate [the officer's] customary right to place an arrestee in handcuffs during the arrest").[1]

Unfortunately, the majority is not content to speak with one voice and resolve this case on the noncontroversial immunity grounds. Instead, the majority reaches out unnecessarily to hold that E.W. has presented sufficient evidence to withstand summary judgment on her claims that Deputy Dolgos used excessive force and committed assault and battery by handcuffing her during the custodial arrest. In doing so, the majority

---

[1] In many citations throughout this opinion, I have refrained from using parentheticals to note my routine alterations or omissions from quoted material.

29

disregards the undisputed objective fact that Deputy Dolgos handcuffed E.W. in preparation for transporting her from school to juvenile authorities, thereby erroneously judging the deputy's actions without considering the totality of the circumstances. Compounding this factual error, the majority significantly extends our precedent in a novel and uncertain manner that subjects law enforcement officers to potential liability for simply handcuffing a lawful custodial arrestee. The majority's holding runs counter to the prevailing federal rule and provides little, if any, guidance for law enforcement officers going forward.[2]

I concur only in the result reached by the majority – *i.e.*, the affirmance of summary judgment in Deputy Dolgos' favor. I write separately to explain my disagreement with the majority's holding regarding the merits of E.W.'s federal and state claims. Simply put, on this record, the deputy's conduct is lawful under federal and state law.

I

The following material facts are not disputed. On January 9, 2015, Deputy Dolgos had been a law enforcement officer for more than 15 years, and a school resource officer

---

[2]Although it sometimes may be beneficial to decide the constitutional violation issue before proceeding to the qualified immunity analysis, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Court has "detailed a range of circumstances in which courts should address only the immunity question" and has instructed that "courts should think hard, and then think hard again, before turning small cases into large ones." *Camreta v. Greene*, 563 U.S. 692, 707 (2011); see also *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) ("Courts should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case."). Included among the circumstances counseling in favor of judicial restraint in this instance are the fact that this case "is so factbound that the decision provides little guidance for future cases" and the legal issues have not been adequately briefed. *Pearson*, 555 U.S. at 237, 239.

for over 10 years. That day, she reported to East Salisbury Elementary School, where school officials briefed her about an incident that occurred between E.W. and another female student on a moving school bus three days earlier. The school vice-principal told Deputy Dolgos that the incident was recorded on video and depicted "an attack by one student on another, and not a fight between students." J.A. 22. Deputy Dolgos viewed the video, which shows E.W. standing over and repeatedly hitting and kicking the other student, who was seated on the bus and essentially defenseless.

Deputy Dolgos interviewed both students individually in a school office and in the presence of one or more school officials. While speaking with the victim, Deputy Dolgos confirmed that she suffered several injuries during the attack. During her interview with E.W., Deputy Dolgos explained why she was there, but E.W. seemed unconcerned about the seriousness of what had happened. E.W. admitted that she kicked the victim at least five times and hit her three times, and she attempted to justify her behavior by claiming that the victim had stepped on her shoe. The victim had denied that assertion in her interview, and Deputy Dolgos did not see the victim do anything in the video to prompt the attack.[3] Deputy Dolgos told E.W. that adults could be jailed for such behavior, but E.W. "continued to act as if the situation simply was not a 'big deal.'" J.A. 23. At the conclusion

---

[3]The school bus driver suspended both students from the bus, and the majority clearly believes that the victim shares blame for E.W.'s violence. *See, e.g.*, *Majority Op.*, at 14 ("Even as to the altercation on the school bus, E.W., while unjustified in retaliating, did not become violent without physical provocation by [the victim]."). I tend to disagree on this point, but our disagreement is immaterial because the majority agrees that Deputy Dolgos had probable cause to arrest E.W.

31

of her interview with E.W., Deputy Dolgos determined that she had probable cause to take E.W. into custody.

Departmental policy specified that juveniles taken into custody for criminal-type offenses were subject to the same security requirements as adults and could "be handcuffed or otherwise restrained as necessary during transport and processing." J.A. 44. This policy instructed officers that in deciding whether to handcuff an arrested juvenile, "primary importance is the physical safety of all persons present," and it specified that officers should consider the number of deputies present and the juvenile's physique, reputation for violence, conduct at the time of arrest, known arrest record, and community standing. J.A. 47-48.

Deputy Dolgos was the only law enforcement officer on the scene, and other than what she had observed, she "knew nothing of any past or current behavioral issues or past involvements with law enforcement involving [E.W.]" J.A. 24. Consistent with departmental policy, she explained her rationale for handcuffing E.W.:

> My primary concern was the physical safety of all persons present. I had observed [E.W.] physically attack another student on a moving school bus, and she seemed unconcerned by the seriousness of what had and what might occur. *I believed that there was a possibility that [E.W.] could physically act out against me or anyone else nearby as we left the school to go to my patrol car*.

J.A. 24 (emphasis added).

Deputy Dolgos handcuffed E.W. in a manner to ensure that the handcuffs were not too tight, she did not use any additional force to secure E.W., and E.W. was not injured during the handcuffing. Shortly after E.W. was handcuffed, she "began crying, saying that

32

she didn't want to go to jail, and that she wouldn't do it again." J.A. 24. In response, Deputy Dolgos consulted with the vice-principal and exercised her discretion to release E.W. from custody and allow her to leave school with a parent. Deputy Dolgos then removed the handcuffs, which had been on E.W. for approximately two minutes. Eventually, E.W.'s mother picked her up from school. Despite releasing E.W. into her mother's custody, Deputy Dolgos was required to inform juvenile authorities about the incident.

The foregoing undisputed evidence establishes that Deputy Dolgos handcuffed E.W. during the course of a lawful custodial arrest *and* in preparation for transporting her from school to juvenile authorities. Critically, however, the majority disregards the undisputed fact that Deputy Dolgos was preparing to transport E.W. from school when she handcuffed her.[4] Instead, calling her "callous," *Majority Op.* at 27, the majority treats Deputy Dolgos' action as being tantamount to sending E.W. to "timeout" for instructive and/or punitive reasons. *See, e.g.*, *Majority Op.*, at 13 (stating that "E.W. was in a closed office and surrounded by two school administrators and a deputy sheriff" when she was handcuffed); at 26 ("[Deputy Dolgos] was bothered by E.W.'s lack of remorse or concern for hitting [the victim]. This is evident from [the deputy's] affidavit."); at 27 ("[A] reasonable jury could infer that [Deputy Dolgos'] actions were motivated by a desire to dissuade E.W.'s apathy and induce remorse."). Further denigrating Deputy Dolgos'

---

[4]The majority dismisses the fact that Deputy Dolgos handcuffed E.W. in preparation for transport based on its erroneous view that this is an irrelevant subjective fact. *See Majority Op*., at 20 n.10. However, the fact of the pending transport is an objective, operative circumstance of this case that must be considered in assessing the reasonableness of Deputy Dolgos' conduct.

conduct, the majority states that she "kept [E.W.] handcuffed for about two minutes as she cried and apologized," *Majority Op.*, at 6, clearly implying that the deputy deliberately delayed removing the handcuffs until she was satisfied with E.W.'s remorse. That implication, however, does not accurately reflect what transpired: *i.e.*, after E.W. started crying, Deputy Dolgos consulted with the vice-principal before deciding to release E.W. into her mother's custody.

## II

The Fourth Amendment protects persons from unreasonable seizures.[5] Although "an arrested person is not invariably taken to a police station or confined," *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983), "all arrests involve serious intrusions into an individual's privacy and dignity," *Payton v. New York*, 445 U.S. 573, 615 (1980) (White, J., dissenting), and the intrusions are heightened when a custodial arrest is made, *see, e.g.*, *United States v. Robinson*, 414 U.S. 218, 235 (1973) (holding that law enforcement officers are authorized to conduct a full search of every lawful custodial arrestee). Given the indignity that is "attendant to normal incidents of arrest," *Maryland v. King*, 569 U.S. 435, 464 (2013), it is not surprising that a custodial arrest is considered to be a "humiliating" experience, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), and the embarrassment is "inherent" in the arrest itself, *Birchfield v. North Dakota*, 136 S.Ct. 2160, 2177 (2016). Nonetheless, "a custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment." *Robinson*, 414 U.S. at 235. Because

---

[5]The Fourth Amendment analysis is applicable to E.W.'s state-law claims. *See Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000).

the majority appears to agree that Deputy Dolgos had probable cause to arrest E.W. and take her into custody, the legality of the deputy's actions for purposes of this appeal hinges only on her decision to handcuff E.W.

A.

The Supreme Court has explained that the process of making a custodial arrest involves particular danger to an officer because of the extended exposure which follows the taking of the arrestee into custody and transporting him for further proceedings, and the "danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty, and not from the grounds for arrest." *Knowles v. Iowa*, 525 U.S. 113, 117 (1998). Elaborating on this point, the Court has observed:

> Every arrest must be presumed to present a risk of danger to the arresting officer. There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger. Moreover, the possibility that an arrested person will attempt to escape if not properly supervised is obvious.

*Washington v. Chrisman*, 455 U.S. 1, 7 (1982); *see also Robinson*, 414 U.S. at 234-35 ("It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop.").

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Of course, the use of force must be reasonable:

As in other areas of our Fourth Amendment jurisprudence, determining whether the force used to effect a particular seizure is reasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests. The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure.

The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case. And the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Excessive force claims are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

*County of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1546-47 (2017).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396. For purposes of determining whether force used during an arrest is reasonable, pertinent considerations include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* This list is illustrative but not exhaustive. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015).

"To properly consider the reasonableness of the force employed we must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015). Moreover, in analyzing Fourth Amendment claims, the Court has admonished that "judges should be

36

cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation," *Ryburn v. Huff*, 132 S.Ct. 987, 991-92 (2012), and "an arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation," *Washington*, 455 U.S. at 7.

B.

The alleged excessive force in this case is Deputy Dolgos' use of handcuffs. Handcuffing, or in the majority's provocative words, "binding a person's wrists in chains," *Majority Op.*, at 11, is part of "the normal custodial arrest," even when the arrest is for a relatively minor offense, *Atwater*, 532 U.S. at 354 (seatbelt violation), and the use of handcuffs serves to minimize the risk of harm to officers, the arrestee, and bystanders, *see Muehler v. Mena*, 544 U.S. 93, 100 (2005). Common sense and experience teach that "it is a normal and regular as well as a highly desirable and necessary practice to handcuff prisoners when they are being taken from one place to another." *Wharton v. Chappell*, 765 F.3d 953, 965 (9th Cir. 2014).

Given the universal acceptance of handcuffing as an appropriate safety measure incident to arrest, we have previously stated that "a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified in effecting the underlying arrest." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). Although we have not since elaborated on the type of circumstance that would constitute the rare exception where an excessive force handcuffing claim might be permissible, we held prior to *Brown* that an arrestee's claim that her handcuffs were too tight "is so insubstantial that

37

it cannot as a matter of law support her claim under the Fourth Amendment." *Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999).

A quick survey of federal caselaw reveals that the majority of federal circuit courts that have considered this issue have rejected the notion that handcuffing a custodial arrestee, *without more*, is excessive. *See, e.g.*, *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) ("When there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment."); *Curran v. Aleshire*, 800 F.3d 656, 662 n.6 (5th Cir. 2015) ("Handcuffing is a ubiquitous practice in performing an arrest, and we have repeatedly stated that handcuffing alone - without more - is not constitutionally excessive."); *Fisher v. City of Las Cruces*, 584 F.3d 888, 897 (10th Cir. 2009) ("To recover on his handcuffing claim, Fisher must show both that the force used was more than reasonably necessary and *some actual injury* caused by the unreasonable seizure *that is not de minimis*, be it physical or emotional.");[6] *Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003) ("Braun also claims to have been subjected to excessive force in the course of his arrest, mainly because the handcuffs were fastened too tightly, but as there is no indication that his arrest was effected in an unusual or improper manner, the excessive-force claim

---

[6]Concurring in *Fisher*, then Circuit Judge (now Justice) Gorsuch noted: "*Graham* offers little guidance in tight handcuffing cases because police officers almost always may use handcuffs in the course of a lawful arrest, regardless of the severity of the crime, the dangerousness of the suspect, or any attempts at flight - *Graham's* three factors." 584 F.3d at 902 n.1. He explained that the Tenth Circuit requires proof of actual injury to fill the "analytical void" left open by *Graham*. *Id.* at 902.

has no possible merit."); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003) (explaining that "for the application of handcuffs to amount to excessive force there must be something beyond allegations of minor injuries"); *Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.").[7]

The Missouri Court of Appeals has succinctly explained the basic rationale underlying these decisions:

> Police officers face serious risks every time they carry out an arrest. Sometimes the most inoffensive appearing individuals turn out to be uncharacteristically violent. A police officer who is proceeding to convey any prisoner to a police headquarters in a police vehicle should not be faced with a civil law suit because he takes the precaution to handcuff the prisoner to prevent her from causing trouble on the way to headquarters.

*Healy v. City of Brentwood*, 649 S.W.2d 916, 919 (Mo. Ct. App. 1983).

The majority correctly notes that in *Soares v. Connecticut*, 8 F.3d 917, 921 (2d Cir. 1993), the Second Circuit declined to adopt a rule that handcuffing an arrestee is *per se* reasonable. As is evident from our *Brown* opinion, we also have not adopted such a rule. However, in reaching its decision, the Second Circuit noted that "handcuffing will be the reasonable course in many, if not most arrest situations," *id.*, and several Second Circuit district courts have interpreted *Soares* in a manner consistent with the prevailing federal

---

[7]In *Kopec v. Tate*, 361 F.3d 772 (3rd Cir. 2004), the Third Circuit reversed summary judgment in favor of an officer on a handcuffing claim where the evidence showed that the officer placed handcuffs on the plaintiff that were excessively tight and failed to respond to repeated requests to loosen them, thereby causing severe pain and permanent nerve damage. However, the court cautioned that the "opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims." *Id.* at 777.

rule. *See, e.g.*, *Selvaggio v. Patterson*, 93 F.Supp. 3d 54, 74 (E.D.N.Y. 2015) ("District courts in this circuit have developed a three-prong analysis used to evaluate an excessive force claim based solely on tight handcuffing. The court considers whether: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists."); *Fera v. City of Albany*, 568 F.Supp. 2d 248, 253 (N.D.N.Y. 2008) ("It is undisputed that Plaintiff did not resist efforts to be arrested and walked out of the building with the officers. She was being arrested for trespass after refusing to leave the Social Security building, where she had appeared for a hearing, and there is no evidence that she threatened violence. *Of course, without additional evidence, the continued use of handcuffs and the placement of Plaintiff in the police wagon in these circumstances could not be the basis for an excessive force claim.*") (emphasis added).

In a nutshell, the prevailing federal rule appears to be that an arrestee may pursue a Fourth Amendment excessive force claim based on the use of handcuffs only in very limited circumstances, such as when the handcuffing causes physical injury. That type of circumstance would likely qualify as the rare instance we recognized in *Brown* where handcuffing a lawful custodial arrestee may be unreasonable. However, there is scant authority for the proposition that handcuffing an arrestee, *without more*, may constitute excessive force.

C.

E.W. is a juvenile, and as the majority's opinion illustrates**,** it is, perhaps, tempting to trivialize the risks associated with arresting and transporting a juvenile. However, in

40

addition to protecting themselves and bystanders, law enforcement officers have a "duty to look after the reasonable safety requirements of persons in their custody," *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000), and "an arrestee's age does not necessarily undermine an officer's concern for safety and need to control the situation," *J.H. v. Bernalillo County*, 806 F.3d 1255, 1259 (10th Cir. 2015). Indeed, although juveniles typically lack the physical attributes of adults, they nonetheless present special safety issues. "A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults," and "these qualities often result in impetuous and ill-considered actions and decisions." *Johnson v. Texas*, 509 U.S. 350, 367 (1993). "Children, especially younger children, are active, unpredictable, and in need of constant attention and supervision. Even momentary inattention or delay in dealing with a potentially dangerous or emergency situation could have grievous consequences." *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 378 (6th Cir. 1998).

As a general matter, the handcuffing of a juvenile-arrestee for a relatively minor offense is undoubtedly unsettling, but it is also undoubtedly legal under the Fourth Amendment. For example, in *Bernalillo County*, which involved the custodial arrest and handcuffing of an eleven-year-old student who kicked a teacher, the Tenth Circuit explained that the existence of probable cause empowered the officer to make an arrest, and "that power did not depend on classification of the arrestee (adult versus juvenile) or the crime (felony versus misdemeanor); law enforcement officers can arrest minors, as well as adults, even when the crime involves only a misdemeanor." 806 F.3d at 1258. Turning specifically to the student's excessive force claim, the court held: "Once [the officer] made

41

the arrest, he could restrict [the student's] freedom of movement by taking her to the juvenile detention center. And for his own protection, [the officer] could keep [her] in handcuffs for the trip to the detention center." *Id.* Similarly, in an opinion authored by then Circuit Judge (now Chief Justice) Roberts, the D.C. Circuit concluded that the custodial arrest and handcuffing of a twelve-year-old girl for eating a french fry in a subway station (thereby violating D.C.'s "delinquent act" law) did not violate the Fourth Amendment. *Hedgepeth v. W.M.A.T.A.*, 386 F.3d 1148 (D.C. Cir. 2004).[8]

Because E.W.'s arrest occurred in Maryland, and Maryland law governs her state-law claims, *Branch v. McGeeney*, 718 A.2d 631 (Md. App. 1998), is instructive. In *Branch*, officers responded to an apartment tenant's complaint about children throwing acorns against the side of the apartment building. After observing nine-year-old Latrice Branch throw an object against a window, the officers detained her for destruction of property. The officers mistakenly believed that they were required to transport Branch to the police station for fingerprinting, and standard operating procedure dictated that anytime an officer transported an arrestee (adult or juvenile) to the police station in a police car, the arrestee was to be handcuffed.

---

[8]The Fifth Circuit recently held that the Fourth Amendment was not violated by a strip and cavity search of a twelve-year-old female who was arrested for fighting at school, handcuffed, and taken to a juvenile facility. *See Mabry v. Lee County*, 849 F.3d 232 (5th Cir. 2017). The search preceded the girl's entry into general population at the facility and was conducted as a matter of standard policy rather than reasonable suspicion. I note this case merely to illustrate the breadth of potential consequences that a juvenile may lawfully experience as a result of an arrest for a relatively minor offense.

Initially, the officers intended to handcuff Branch once she was placed in the police car, but a crowd began protesting the arrest, and the officers decided to handcuff Branch immediately. The officers made Branch kneel down while they handcuffed her behind her back, and they placed her in the police car, where she remained for approximately 25 minutes. During that time, Branch was crying, but the officers refused to permit her to speak with her mother. Eventually, the officers issued a juvenile citation and released Branch to her mother's custody.

Branch sued the officers for a variety of federal and state-law claims, including excessive force, assault, and battery. The officers moved for summary judgment, asserting (among other things) that the handcuffing was reasonable and lawful. Analyzing these claims, the court acknowledged that Branch did not try to flee or otherwise resist the arrest and that "the officers were not in fear" of her. *Id.* at 641. Even so, the court concluded that summary judgment in the officers' favor was proper. Looking at the constitutional reasonableness of the handcuffing for the federal and state excessive force claims, the court stated:

> The facts remain that the officers had probable cause to arrest and that [Branch] was not physically injured in any way. Handcuffing [Branch] was entirely reasonable under the circumstances, given that she was already under arrest, *she would soon be handcuffed for transport anyway*, and the officers feared for her safety.

*Id.* at 641-42 (emphasis added). The court further found that the probable cause determination necessarily defeated the other state-law claims on the merits.[9]

### III

In evaluating an alleged Fourth Amendment violation, "we must uphold a police officer's actions – regardless of the officer's subjective intent – if sufficient objective evidence exists to validate the challenged conduct." *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010). "The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure," and "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Mendez*, 137 S.Ct. at 1546.

### A.

To be clear, this is not a case (as described by the majority) where a police officer handcuffed a child and forced her to sit in a closed room surrounded by adults for disciplinary or instructional reasons. Instead, the undisputed facts establish that: Deputy Dolgos had probable cause to arrest and take E.W. into custody; before she changed her

---

[9]The majority states that I believe children "are so inherently unpredictable and uncontrollable that officers would be reasonable in restraining them for our collective safety," *Majority Op.*, at 16, and it criticizes my reference to several cases regarding the general characteristics of juveniles and the general legality of handcuffing them as part of a custodial arrest. The majority's criticism of my position is misguided. Certainly, the majority does not disagree that law enforcement officers may lawfully restrain juveniles when they have a legitimate basis for doing so or that juveniles do, in fact, present special security considerations. The majority may disagree that a lawful custodial arrest of a juvenile is a legitimate basis for handcuffing, but there is no doubt that the authorities I have cited support the view that handcuffing an arrested juvenile for custody purposes is generally considered to be entirely lawful.

44

mind, she was preparing E.W. for transport from school to juvenile authorities; and she handcuffed E.W. in preparation for transport. Viewing the totality of circumstances, as we are required to do, and mindful of the universal acceptance of handcuffing custodial arrestees, the inherent danger presented in every custodial arrest, and the natural unpredictability of juveniles, it is clear as a matter of law that the deputy's use of handcuffs in this instance was objectively reasonable.

Admittedly, the crime for which E.W. was arrested, although violent, is relatively minor; Deputy Dolgos was larger than E.W.; she applied the handcuffs in the presence of at least one other adult; and E.W. appeared compliant at that moment. However, these facts do not portray the *totality* of the circumstances. Instead, it is important to recognize that this was a fluid situation, and Deputy Dolgos knew that E.W. had violently attacked a fellow student on a moving school bus a few days earlier. Deputy Dolgos also knew that E.W. seemed unconcerned about the seriousness of her criminal behavior. Moreover, Deputy Dolgos did not know whether E.W. had a history of similar misbehavior, and she certainly could not predict with any sense of assurance how E.W. would react when she began escorting her from the school office to her vehicle for transport.

Perhaps E.W. would have gone quietly, but she might also have fled or otherwise resisted. Because Deputy Dolgos decided to release E.W. into her mother's custody, we cannot know how this would have ultimately turned out, but we do know that once E.W. realized she was under arrest, she "display[ed] the maturity of a ten-year-old child, [and] began crying profusely and apologizing because she was afraid of going to jail." *Majority Op.*, at 26-27. It is not at all farfetched to envision E.W.'s completely understandable

45

emotional reaction to being arrested escalating beyond mere tears during the custodial transport, and one can easily imagine the outcry if, instead of handcuffing E.W., Deputy Dolgos had chosen, or been forced, to control E.W. using a more physical "hands on" approach.

In short, under the totality of the objective circumstances present in this case, which the majority fails to consider, and in light of the overwhelming acceptance of handcuffing as a lawful incident of a custodial arrest, Deputy Dolgos' use of handcuffs as a relatively minor safety precaution was objectively reasonable. I would hold as a matter of law that Deputy Dolgos did not use excessive force or commit assault or battery.

## B.

As I have explained, the majority's contrary decision is premised on its failure to view Deputy Dolgos' conduct in light of the totality of the objective circumstances. Given our agreement on the immunity issues and the ultimate affirmance of summary judgment in Deputy Dolgos' favor, my disagreement with the majority over the manner in which it has factually analyzed this case ultimately may have little affect beyond this case. However, I believe that the legal underpinnings of the majority's decision portend difficulties for law enforcement officers going forward. Although the majority purports to simply apply the well-established *Graham* factors for determining whether Deputy Dolgos used excessive force, it ominously warns that its "excessive force holding is clearly established for any future qualified immunity cases involving similar circumstances." *Majority Op.*, at 24. Despite this warning, however, the majority does not clearly define the parameters of its holding.

46

If the excessive force holding is limited to the majority's view of the facts of this case (*i.e.*, Deputy Dolgos handcuffed E.W. for disciplinary reasons with no intention of transporting her), then it seems to be relatively narrow: law enforcement officers may not handcuff an arrested juvenile at school simply to punish or teach him a lesson. Interpreted in this manner, the majority's holding would be rather obvious and unexceptional. *See, e.g.*, *Gray v. Bostic*, 458 F.3d 1295, 1307 (11th Cir. 2006) ("We conclude that Deputy Bostic's conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment rights. . . . Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable.").[10]

I suspect, however, that the majority intends its excessive force holding to be broader. It is certainly not unreasonable to read the majority opinion as opening the door to permit all custodial arrestees to pursue (but not necessarily win) excessive force claims based on the mere fact that they were handcuffed. It may, perhaps, be slightly more reasonable to read the majority opinion as being limited to cases involving the handcuffing

---

[10]*Gray* is one of several cases cited by the majority that are noteworthy for their inapplicability to this case. Among the other cases are *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167 (6th Cir. 2004), where officers used considerable physical force to handcuff an adult female, eventually fracturing her elbow in the process; *Tekle v. United States*, 511 F.3d 839 (9th Cir. 2007), where officers who were executing a search warrant detained a compliant 11-year-old boy who exited the house clad in shorts and a t-shirt, placed him on the ground facedown, held a gun to his head, handcuffed him, pulled him up from behind by the handcuff chain, and forced him to remain handcuffed with guns pointed at him for 15 minutes; and *Ikerd v. Blair*, 101 F.3d 430, 431 (5th Cir. 1996), where the officer "injured a ten-year-old girl when he violently and without cause jerked her out of a chair in the living room of her home and dragged her across the room by the arm."

47

of certain juveniles who are arrested at school. Of course, either reading extends well beyond our precedent, runs counter to the prevailing federal rule, and will hinder law enforcement officers in safely and efficiently performing their duties.

Instead of being able to handcuff arrestees for custodial transport as a matter of course for obvious and practical safety reasons, which is the standard procedure in virtually all custodial arrests, officers subject to the majority decision will now have to make on-the-spot predictions about whether every arrestee will peacefully submit to the arrest and transport. Their *ad hoc* predictions will potentially be subjected to judicial second-guessing based on a variety of factors (both known and unknown to the officers) that should be irrelevant to the handcuffing determination. Included among these factors are the relative age or size disparity between the officer and arrestee, the arrestee's gender or background, the potential emotional consequences that an arrestee may one day suffer as a result of the arrest and handcuffing, and anything else a reviewing court may deem to be pertinent.

As one example of the difficulties created by the majority's decision, I note that the majority emphasizes that this case does not involve the arrest of an adult "or even a teenager." *Majority Op*., at 12. I am skeptical that the majority would find the handcuffing reasonable in this case if E.W. had been a teenager at the time of the arrest, but the arbitrary age distinction implied by the majority illustrates the dilemma that officers face under the majority's analysis. Moreover, age is certainly not the only potential variable in play. Although I am again skeptical whether the majority would find the handcuffing reasonable in this case if E.W. had been taller or heavier, or male, the majority's analysis certainly leaves open that possibility.

48

Unfortunately, law enforcement officers cannot know how courts will view those or any other factors in litigation, and the majority provides no real guidance to assist them. Thus, despite the Supreme Court's unequivocal recognition of the inherent dangers associated with *all* custodial arrests, the majority's decision will inevitably lead officers who are subject to the decision to avoid using handcuffs during some custodial arrests. This restriction is not compelled by the Fourth Amendment or Maryland law, and it will further hinder officers' ability to perform their duties in a safe and effective manner for themselves, the arrestees, and the public.

IV

It is apparent that the majority's fundamental complaint is not Deputy Dolgos' use of the handcuffs *per se*. Instead, the majority is troubled by the deputy's decision to arrest E.W., which led to the handcuffing and is, itself, the real source of any embarrassment that E.W. may have suffered. *See Birchfield*, 136 S.Ct. at 2177; *Atwater*, 532 U.S. at 354. Despite its apparent displeasure about the wisdom of the arrest, which is not a matter within our purview, the majority does not question its legality or the deputy's right to take E.W. into custody for transport. Based on the totality of the objective circumstances, the Fourth Amendment and Maryland law clearly permitted Deputy Dolgos to handcuff E.W. for transport away from school. Unfortunately, the majority has needlessly ruled otherwise. In doing so, it has both besmirched the deputy's professional standing and put many, if not all, law enforcement officers (and perhaps other citizens) in this circuit in a potentially dangerous situation going forward.

Based on the foregoing, I disagree with the majority's determination that Deputy Dolgos is not entitled to summary judgment on the merits of the excessive force, assault, and battery claims. However, I concur in the judgment to the extent that it affirms summary judgment in Deputy Dolgos' favor on immunity grounds.